GENERAL BUILDING CONTRACTORS ASSOCIA-
TION, INC. *v.* PENNSYLVANIA ET AL.

No. 81–280.   Argued March 3, 1982—Decided June 29, 1982*

---

*Together with No. 81–330, *United Engineers & Constructors, Inc.* v. *Pennsylvania et al.;* No. 81–331, *Contractors Association of Eastern Pennsylvania et al.* v. *Pennsylvania et al.;* No. 81–332, *Glasgow, Inc.* v. *Pennsylvania et al.;* and No. 81–333, *Bechtel Power Corp.* v. *Pennsylvania et al.,* also on certiorari to the same court.

376

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined, and in Parts III and IV of which STEVENS, J., joined. O'CONNOR, J., filed a concurring opinion, in which BLACKMUN, J., joined, *post*, p. 403. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 405. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 407.

*John J. McAleese, Jr.,* argued the cause for petitioners in Nos. 81–330, 81–331, 81–332, and 81–333. With him on the briefs for petitioners in Nos. 81–331 and 81–332 was *Thomas J. McGoldrick. Bernard G. Segal, Martin Wald,* and *Nicholas N. Price* filed briefs for petitioner in No. 81–330. *Robert W. Kopp* and *David M. Pellow* filed briefs for petitioner in No. 81–333.

*John G. Kester* argued the cause for petitioner in No. 81–280. With him on the briefs was *John J. Buckley, Jr.*

*Harold I. Goodman* argued the cause for respondents in all cases. With him on the brief for individual and class respondents were *Jonathan M. Stein* and *Robert J. Reinstein. LeRoy S. Zimmerman,* Attorney General of Pennsylvania, and *Joel M. Ressler, Louis J. Rovelli,* and *Margaret Hunting,* Assistant Attorneys General, filed a brief for respondent Commonwealth of Pennsylvania. *Kenneth I. Jonson* filed a brief for respondent Local 542, International Union of Operating Engineers.†

---

†Briefs of *amici curiae* urging reversal were filed by *Robert E. Williams, Douglas S. McDowell,* and *Thomas R. Bagby* for the Equal Employment Advisory Council; by *Anthony J. Obadal* and *Alan D. Cirker* for the National Constructors Association; and by *Daniel J. Popeo, Paul D. Kamenar,* and *Nicholas E. Calio* for the Washington Legal Foundation.

*Thomas I. Atkins* and *Michael H. Sussman* filed a brief for the National Association for the Advancement of Colored People as *amicus curiae* urging affirmance.

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents, the Commonwealth of Pennsylvania and the representatives of a class of racial minorities who are skilled or seek work as operating engineers in the construction industry in Eastern Pennsylvania and Delaware, commenced this action under a variety of federal statutes protecting civil rights, including 42 U. S. C. § 1981. The complaint sought to redress racial discrimination in the operation of an exclusive hiring hall established in contracts between Local 542 of the International Union of Operating Engineers and construction industry employers doing business within the Union's jurisdiction. Respondents also alleged discrimination in the operation of an apprenticeship program established by Local 542 and several construction trade associations. Named as defendants were Local 542, the trade associations, the organization charged with administering the trade's apprenticeship program, and a class of approximately 1,400 construction industry employers. Petitioners, the defendant contractors and trade associations, seek review of a judgment granting an injunction against them. The questions we resolve are whether liability under 42 U. S. C. § 1981 requires proof of discriminatory intent and whether, absent such proof, liability can nevertheless be imposed vicariously on the employers and trade associations for the discriminatory conduct of the Union.

## I

The hiring hall system that is the focus of this litigation originated in a collective-bargaining agreement negotiated in 1961 by Local 542 and four construction trade associations in the Philadelphia area, three of whom are petitioners in this Court.[1] The agreement was concluded only after a 10-week strike prompted by the resistance of the trade associations to

---

[1] The petitioner associations are the General Building Contractors Association (GBCA), the Contractors Association of Eastern Pennsylvania (CAEP), and the United Contractors Association (UCA). The fourth

the Union's demand for an exclusive hiring hall.[2] Under the terms of the agreement, the Union was to maintain lists of operating engineers, or would-be engineers, classified according to the extent of their recent construction experience. Signatory employers were contractually obligated to hire operating engineers only from among those referred by the Union from its current lists. Workers affiliated with the Union were barred from seeking work with those employers except through Union referrals. Thus, the collective-bargaining agreement effectively channeled all employment opportunities through the hiring hall. Since 1961 this requirement has been a constant feature of contracts negotiated with Local 542 by the trade associations, as well as of contracts signed with the Union by employers who were not represented by one of those associations in collective bargaining.[3]

Among the means of gaining access to the Union's referral lists is an apprenticeship program established in 1965 by Local 542 and the trade associations. The program, which involves classroom and field training, is administered by the Joint Apprenticeship and Training Committee (JATC), a body of trustees half of whom are appointed by the Union and half by the trade associations. While enrolled in the program, apprentices are referred by the Union for unskilled construction work. Graduates of the program become journeymen operating engineers and are referred for heavy equipment jobs.

---

group, the Pennsylvania Excavating Contractors Association, was dissolved in 1972 after the commencement of this action.

[2] A second strike occurred in 1963 when the contractor associations unsuccessfully sought to remove the hiring hall provision from the area collective-bargaining agreement.

[3] The District Court found that "a vast majority of the employers are not and have not been active members of the defendant associations." *Pennsylvania* v. *Local 542, Int'l Union of Operating Engineers*, 469 F. Supp. 329, 342 (ED Pa. 1978). Nevertheless, the court found that "the negotiations conducted by those bodies have established a standard to which the unaffiliated contractors may conform." *Ibid.*

This action was filed in 1971 by the Commonwealth of Pennsylvania and 12 black plaintiffs representing a proposed class of minority group members residing within the jurisdiction of Local 542. The complaint charged that the Union and the JATC had violated numerous state and federal laws prohibiting employment discrimination, including Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV), and 42 U. S. C. § 1981. The complaint alleged that these defendants had engaged in a pattern and practice of racial discrimination, by systematically denying access to the Union's referral lists, and by arbitrarily skewing referrals in favor of white workers, limiting most minority workers who did gain access to the hiring hall to jobs of short hours and low pay. The contractor employers and trade associations were also named as defendants, although the complaint did not allege a Title VII cause of action against them.[4]

The District Court divided the trial into two stages. See *Pennsylvania v. Local 542, Int'l Union of Operating Engineers,* 469 F. Supp. 329, 348 (ED Pa. 1978). The first stage, from which petitioners appeal, addressed issues of liability; assessment of damages was deferred to a second stage. For purposes of the first phase of the proceedings, the court certified a plaintiff class of minority operating engineers and would-be engineers, as well as a defendant class consisting of all trade associations and employers who had been parties to labor contracts with Local 542. A single employer, petitioner Glasgow, Inc., was certified to represent the defendant subclass of approximately 1,400 contractor employers.[5]

---

[4] The complaint did not assert a Title VII cause of action against petitioners because they were not named in the complaint filed by the plaintiffs with the Equal Employment Opportunity Commission, a precondition to suit in federal court. See Brief for Individual and Class Respondents 12, n. 18.

[5] Certification of this class evidently was influenced by the District Court's conclusion that liability could be imposed without regard to individualized issues such as the intent or work-force statistics of the individual employers. See 469 F. Supp., at 384, 414. The court emphasized that the determination of liability in damages could require individualized proof; it

The District Court's opinion in the liability phase of the trial is lengthy. For our purposes, however, the relevant findings and conclusions can be summarized briefly. First, the court found that the hiring hall system established by collective bargaining was neutral on its face. *Id.*, at 342. Indeed, after May 1, 1971, the contracts contained a provision expressly prohibiting employment discrimination on the basis of race, religion, color, or national origin. *Id.*, at 340, and n. 6. But the court found that Local 542, in administering the system, "practiced a pattern of intentional discrimination and that union practices in the overall operation of a hiring hall for operating engineers created substantial racial disparities." *Id.*, at 370. The court made similar findings regarding the JATC's administration of the job-training program. *Id.*, at 384. On the basis of these findings, the District Court held that Local 542 and the JATC had violated Title VII, both because they intentionally discriminated and because they enforced practices that resulted in a disparate racial impact. *Id.*, at 397–399.[6] The court also interpreted 42 U. S. C. § 1981 to permit imposition of liability "on roughly the same basis as a Title VII claim," 469 F. Supp., at 401, and therefore concluded that the Union and the JATC had also violated § 1981. *Id.*, at 399–401.

Turning to petitioners' liability under § 1981, the court found that the plaintiffs had failed to prove "that the associations or contractors viewed simply as a class were actually aware of the union discrimination," *id.*, at 401, and had failed to show "intent to discriminate by the employers as a class," *id.*, at 412. Nevertheless, the court held the employers and the associations liable under § 1981 for the purpose of impos-

---

therefore held out the possibility that the defendant class might be decertified in the second stage of the proceedings. *Id.*, at 413, 415, 419–420.

[6] The District Court's legal conclusions addressed only the liability of Local 542. The court explained: "Because of the JATC's participation in the overall intentional discrimination of the union, there is no need to discuss its legal liability separately. The JATC is liable as the union is liable." *Id.*, at 401, n. 52.

ing an injunctive remedy "as a result of their contractual relationship to and use of a hiring hall system which in practice effectuated intentional discrimination, whether or not the employers and associations knew or should have known [of the Union's conduct]." *Id.*, at 401. The court reasoned that liability under § 1981 "requires no proof of purposeful conduct on the part of any of the defendants." *Id.*, at 407. Instead, it was sufficient that "(1) the employers delegated an important aspect of their hiring procedure to the union; [and that] (2) the union, in effectuating the delegation, intentionally discriminated or, alternatively, produced a discriminatory impact." *Id.*, at 412. "[P]laintiffs have shown that the requisite relationship exists among employers, associations, and union to render applicable the theory of *respondeat superior*, thus making employers and associations liable injunctively for the discriminatory acts of the union." *Id.*, at 413.[7]

Following an appeal authorized by 28 U. S. C. § 1292(b), the Court of Appeals for the Third Circuit, sitting en banc, affirmed the judgment of liability against petitioners by an equally divided vote. 648 F. 2d 923 (1981). We granted certiorari, 454 U. S. 939 (1981), and we now reverse.

## II

The District Court held that petitioners had violated 42 U. S. C. § 1981 notwithstanding its finding that, as a class,

---

[7] The District Court absolved petitioners of liability under 42 U. S. C. § 1985(3) (1976 ed., Supp. IV), noting that "no per se or vicarious liability theory could be used to hold a class of employers liable for conspiracy to commit the discrimination practiced by the union." 469 F. Supp., at 413. Absent such a theory, the plaintiffs could not prevail because "there was no sufficient proof that as a class the employers agreed to violate equal protection rights or equal privileges and immunities." *Ibid.* Moreover, "[n]ot even acquiescence of the whole class of employers in the sense of a conscious toleration of the discrimination of the union ha[d] been shown." *Ibid.*

In light of its disposition, the court found it unnecessary to address other causes of action alleged by the plaintiffs. See *id.*, at 386, n. 43.

petitioners did not intentionally discriminate against minority workers and neither knew nor had reason to know of the Union's discriminatory practices. The first question we address, therefore, is whether liability may be imposed under § 1981 without proof of intentional discrimination.[8]

Title 42 U. S. C. § 1981 provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

We have traced the evolution of this statute and its compan-

---

[8] The District Court concluded, by analogy to Title VII, that a violation of § 1981 could be made out by "proof of disparate impact alone." *Id.*, at 401. The court referred to *Griggs* v. *Duke Power Co.*, 401 U. S. 424 (1971), in which we held that Title VII forbids the use of employment tests that produce a disproportionate racial impact unless the employer shows "a manifest relationship to the employment in question," *id.*, at 432. See *Teamsters* v. *United States*, 431 U. S. 324, 335–336 (1977).

The District Court's holding on this issue is contrary to the holding of every Court of Appeals that has addressed the matter, including that of the Third Circuit in a subsequent case. See *Guardians Assn.* v. *Civil Service Comm'n of New York City*, 633 F. 2d 232, 263–268 (CA2 1980), cert. granted, 454 U. S. 1140 (1982); *Croker* v. *Boeing Co.*, 662 F. 2d 975, 984–989 (CA3 1981) (en banc); *Williams* v. *DeKalb County*, 582 F. 2d 2 (CA5 1978); *Mescall* v. *Burrus*, 603 F. 2d 1266, 1269–1271 (CA7 1979); *Craig* v. *County of Los Angeles*, 626 F. 2d 659, 668 (CA9 1980), cert. denied, 450 U. S. 919 (1981); *Chicano Police Officer's Assn.* v. *Stover*, 552 F. 2d 918, 920–921 (CA10 1977). Two other Circuits have approved a requirement of discriminatory intent in dicta. See *Des Vergnes* v. *Seekonk Water Dist.*, 601 F. 2d 9, 14 (CA1 1979); *Detroit Police Officers' Assn.* v. *Young*, 608 F. 2d 671, 692 (CA6 1979), cert. denied, 452 U. S. 938 (1981). See also *Johnson* v. *Alexander*, 572 F. 2d 1219, 1223–1224 (CA8), cert. denied, 439 U. S. 986 (1978); *Donnell* v. *General Motors Corp.*, 576 F. 2d 1292, 1300 (CA8 1978). But see *Kinsey* v. *First Regional Securities, Inc.*, 181 U. S. App. D. C. 207, 215, n. 22, 557 F. 2d 830, 838, n. 22 (1977).

ion, 42 U. S. C. § 1982,[9] on more than one occasion, see, *e. g.*, *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273, 287–296 (1976); *Runyon* v. *McCrary*, 427 U. S. 160, 168–170 (1976); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 422–437 (1968), and we will not repeat the narrative again except in broad outline.

The operative language of both laws apparently originated in § 1 of the Civil Rights Act of 1866, 14 Stat. 27, enacted by Congress shortly after ratification of the Thirteenth Amendment.[10] "The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality." *Georgia* v. *Rachel*, 384 U. S. 780, 791 (1966). The same Congress also passed the Joint Resolution that was later adopted as the Fourteenth Amendment. See Cong. Globe, 39th Cong., 1st Sess., 3148–3149, 3042 (1866). As we explained in *Hurd* v. *Hodge*, 334 U. S. 24, 32–33 (1948) (footnotes omitted):

"Frequent references to the Civil Rights Act are to be found in the record of the legislative debates on the adoption of the Amendment. It is clear that in many significant respects the statute and the Amendment

[9] Section 1982 provides:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

[10] Section 1 of the Act of Apr. 9, 1866, read in part:

"That all persons born in the United States and not subject to any foreign power, . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."

were expressions of the same general congressional policy. Indeed, as the legislative debates reveal, one of the primary purposes of many members of Congress in supporting the adoption of the Fourteenth Amendment was to incorporate the guaranties of the Civil Rights Act of 1866 in the organic law of the land. Others supported the adoption of the Amendment in order to eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States."

Following ratification of the Fourteenth Amendment, Congress passed what has come to be known as the Enforcement Act of 1870, 16 Stat. 140, pursuant to the power conferred by § 5 of the Amendment. Section 16 of that Act contains essentially the language that now appears in § 1981.[11] Indeed, the present codification is derived from § 1977 of the Revised Statutes of 1874, which in turn codified verbatim § 16 of the 1870 Act. Section 16 differed from § 1 of the 1866 Act in at least two respects. First, where § 1 of the 1866 Act extended its guarantees to "citizens, of every race and color," § 16 of the 1870 Act—and § 1981—protects "all persons." See *United States* v. *Wong Kim Ark*, 169 U. S. 649, 675

---

[11] "That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void." 16 Stat. 144.

Section 18 of the 1870 Act also re-enacted the 1866 Act and declared that § 16 "shall be enforced according to the provisions of said act." *Ibid.*

(1898).   Second, the 1870 Act omitted language contained in the 1866 Act, and eventually codified as § 1982, guaranteeing property rights equivalent to those enjoyed by white citizens.   Thus, "[a]lthough the 1866 Act rested only on the Thirteenth Amendment . . . and, indeed, was enacted before the Fourteenth Amendment was formally proposed, . . . the 1870 Act was passed pursuant to the Fourteenth, and changes in wording may have reflected the language of the Fourteenth Amendment."   *Tillman* v. *Wheaton-Haven Recreation Assn.*, 410 U. S. 431, 439–440, n. 11 (1973).   See *Runyon* v. *McCrary*, *supra*, at 168–170, n. 8.

In determining whether § 1981 reaches practices that merely result in a disproportionate impact on a particular class, or instead is limited to conduct motivated by a discriminatory purpose, we must be mindful of the "events and passions of the time" in which the law was forged.   *United States* v. *Price*, 383 U. S. 787, 803 (1966).   The Civil War had ended in April 1865.   The First Session of the Thirty-ninth Congress met on December 4, 1865, some six months after the preceding Congress had sent to the States the Thirteenth Amendment and just two weeks before the Secretary of State certified the Amendment's ratification.   On January 5, 1866, Senator Trumbull introduced the bill that would become the 1866 Act.[12]

The principal object of the legislation was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen.[13]   Most of these laws

---

[12] Cong. Globe, 39th Cong., 1st Sess., 129 (1866).

[13] Discussion of the Black Codes occupied a central place in the congressional debates leading to enactment of the 1866 Act.   See *id.*, at 588–589 (remarks of Rep. Donnelly); 602 (Sen. Lane); 603 (Sen. Wilson); 1123–1124 (Rep. Cook); 1118–1119 (Rep. Wilson); 1151–1152, 1153 (Rep. Thayer); 1160 (Rep. Windom); 1785 (Sen. Stewart); 1833–1835 (Rep. Lawrence); 1838–1839 (Rep. Clarke).   The Codes are described in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 29–44 (1871).

embodied express racial classifications and although others, such as those penalizing vagrancy, were facially neutral, Congress plainly perceived all of them as consciously conceived methods of resurrecting the incidents of slavery.[14] Senator Trumbull summarized the paramount aims of his bill:

"Since the abolition of slavery, the Legislatures which have assembled in the insurrectionary States have passed laws relating to the freedmen, and in nearly all the States they have discriminated against them. They deny them certain rights, subject them to severe penalties, and still impose upon them the very restrictions which were imposed upon them in consequence of the existence of slavery, and before it was abolished. The purpose of the bill under consideration is to destroy all these discriminations, and to carry into effect the [Thirteenth] amendment." Cong. Globe, 39th Cong., 1st Sess., 474 (1866).

Senator Trumbull emphasized: "This bill has nothing to do with the political rights or *status* of parties. It is confined exclusively to their civil rights, such rights as should appertain to every free man." *Id.*, at 476 (emphasis in original).

Of course, this Court has found in the legislative history of the 1866 Act evidence that Congress sought to accomplish more than the destruction of state-imposed civil disabilities and discriminatory punishments. We have held that both § 1981 and § 1982 "prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein." *Jones* v. *Alfred H. Mayer Co.*, 392 U. S., at 436. See *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454, 459–460 (1975); *Runyon* v. *McCrary*, 427 U. S., at 168. Nevertheless, the fact that the prohibitions of § 1981

---

[14] See, *e. g.*, Cong. Globe, 39th Cong., 1st Sess., *supra*, at 1124 (Rep. Cook); 1151–1152 (Rep. Thayer); 1159 (Rep. Windom); 1785 (Sen. Stewart); 1839 (Rep. Clarke). See also *Memphis* v. *Greene*, 451 U. S. 100, 131–135 (1981) (WHITE, J., concurring in judgment).

encompass private as well as governmental action does not suggest that the statute reaches more than purposeful discrimination, whether public or private. Indeed, the relevant opinions are hostile to such an implication. Thus, although we held in *Jones, supra,* that § 1982 reaches private action, we explained that § 1 of the 1866 Act "was meant to prohibit *all racially motivated* deprivations of the rights enumerated in the statute." 392 U. S., at 426 (emphasis on "racially motivated" added). Similarly, in *Runyon* v. *McCrary, supra,* we stated that § 1981 would be violated "if a private offeror refuses to extend to a Negro, *solely because he is a Negro,* the same opportunity to enter into contracts as he extends to white offerees." 427 U. S., at 170–171.

The immediate evils with which the Thirty-ninth Congress was concerned simply did not include practices that were "neutral on their face, and even neutral in terms of intent," *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 430 (1971), but that had the incidental effect of disadvantaging blacks to a greater degree than whites. Congress instead acted to protect the freedmen from intentional discrimination by those whose object was "to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices." Cong. Globe, 39th Cong., 1st Sess., 1839 (1866) (Rep. Clarke). See *Memphis* v. *Greene,* 451 U. S. 100, 131–135 (1981) (WHITE, J., concurring in judgment). The supporters of the bill repeatedly emphasized that the legislation was designed to eradicate blatant deprivations of civil rights, clearly fashioned with the purpose of oppressing the former slaves. To infer that Congress sought to accomplish more than this would require stronger evidence in the legislative record than we have been able to discern.[15]

---

[15] We attach significance to the fact that throughout much of the congressional debates, S. B. 61, which became the 1866 Act, contained an opening declaration that "there shall be no discrimination in civil rights or immunities among citizens of the United States in any State or Territory of the

Our conclusion that § 1981 reaches only purposeful discrimination is supported by one final observation about its legislative history.   As noted earlier, the origins of the law can be traced to both the Civil Rights Act of 1866 and the Enforcement Act of 1870.   Both of these laws, in turn, were legislative cousins of the Fourteenth Amendment.   The 1866 Act represented Congress' first attempt to ensure equal rights for the freedmen following the formal abolition of slavery effected by the Thirteenth Amendment.   As such, it constituted an initial blueprint of the Fourteenth Amendment, which Congress proposed in part as a means of "incorporat[ing] the guaranties of the Civil Rights Act of 1866 in the organic law of the land."   *Hurd* v. *Hodge*, 334 U. S., at 32.[16] The 1870 Act, which contained the language that now appears in § 1981, was enacted as a means of enforcing the recently ratified Fourteenth Amendment.   In light of the close

United States *on account of race, color, or previous condition of slavery.*" See Cong. Globe, 39th Cong., 1st Sess., 474 (1866).   This passage had occasioned controversy in both the Senate and the House because of the breadth of the phrase "civil rights and immunities."   After the Senate had passed the bill and as debates in the House were drawing to a close, the bill's floor manager, Representative Wilson, introduced an amendment proposed by the House Judiciary Committee, of which he was also the Chairman.   That amendment deleted the language quoted above and left the bill as it would read when ultimately enacted.   See n. 10, *supra*.   Representative Wilson explained that the broad language of the original bill could have been interpreted to encompass the right of suffrage and other political rights.   "To obviate that difficulty and the difficulty growing out of any other construction beyond the specific rights named in the section, our amendment strikes out all of those general terms and leaves the bill with the rights specified in the section."   Cong. Globe, 39th Cong., 1st Sess., *supra*, at 1367.   See *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273, 292, n. 22 (1976).   The deleted language, emphasized above, strongly suggests that Congress was primarily concerned with intentional discrimination.   That the passage was removed in an effort to *narrow* the scope of the legislation sharply undercuts the view that the 1866 Act reflects broader concerns.

[16] See, *e. g.*, Cong. Globe, 39th Cong., 1st Sess., *supra*, at 1294 (Rep. Wilson); *id.* at 2465 (Rep. Thayer).

connection between these Acts and the Amendment, it would be incongruous to construe the principal object of their successor, § 1981, in a manner markedly different from that of the Amendment itself.[17]

With respect to the latter, "official action will not be held unconstitutional solely because it results in a racially disproportionate impact," *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 264–265 (1977). "[E]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 272 (1979). See *Washington* v. *Davis*, 426 U. S. 229 (1976). The same Congress that proposed the Fourteenth Amendment also passed the Civil

---

[17] It is true that § 1981, because it is derived in part from the 1866 Act, has roots in the Thirteenth as well as the Fourteenth Amendment. Indeed, we relied on that heritage in holding that Congress could constitutionally enact § 1982, which is also traceable to the 1866 Act, without limiting its reach to "state action." See *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 438 (1968). As we have already intimated, however, the fact that Congress acted in the shadow of the Thirteenth Amendment does not demonstrate that Congress sought to eradicate more than purposeful discrimination when it passed the 1866 Act. For example, Congress also enacted 42 U. S. C. § 1985(3) (1976 ed., Supp. IV) in part to implement the commands of the Thirteenth Amendment. See *Griffin* v. *Breckenridge*, 403 U. S. 88, 104–105 (1971). While holding that § 1985(3) does not require state action but also reaches private conspiracies, we have emphasized that a violation of the statute requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.*, at 102.

We need not decide whether the Thirteenth Amendment itself reaches practices with a disproportionate effect as well as those motivated by discriminatory purpose, or indeed whether it accomplished anything more than the abolition of slavery. See *Memphis* v. *Greene*, 451 U. S., at 125–126. We conclude only that the existence of that Amendment, and the fact that it authorized Congress to enact legislation abolishing the "badges and incidents of slavery," *Civil Rights Cases*, 109 U. S. 3, 20 (1883), do not evidence congressional intent to reach disparate effects in enacting § 1981.

Rights Act of 1866, and the ratification of that Amendment paved the way for the Enforcement Act of 1870. These measures were all products of the same milieu and were directed against the same evils. Although Congress might have charted a different course in enacting the predecessors to § 1981 than it did in proposing the Fourteenth Amendment, we have found no convincing evidence that it did so.

We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination.

## III

The District Court held petitioners liable under § 1981 notwithstanding its finding that the plaintiffs had failed to prove intent to discriminate on the part of the employers and associations as a class. In light of our holding that § 1981 can be violated only by intentional discrimination, the District Court's judgment can stand only if liability under § 1981 can properly rest on some ground other than the discriminatory motivation of the petitioners themselves. Both the District Court and respondents have relied on such grounds, but we find them unconvincing.

## A

The District Court reasoned that liability could be vicariously imposed upon the employers and associations, based upon the intentional discrimination practiced by Local 542 in its operation of the hiring hall. The court's theory was that petitioners had delegated to the "union hiring hall" the authority to select workers as "the agent for two principals— the union and the contractors, with their respective associations." 469 F. Supp., at 411. Since the hiring hall came into existence only through the agreement of petitioners, and since the exclusive hiring hall was the means by which "the intentional discrimination of the union was able to work its way broadly into the common workforce of operating engineers," id., at 412, the court concluded that "[t]he acts of the union therefore justify imposition of responsibility upon

those employers participating in the original delegation,"
*ibid.* The effect of this holding, as the court recognized, was
to impose a "duty to see that discrimination does not take
place in the selection of one's workforce," regardless of where
the discrimination originates. *Ibid.*

As applied to the petitioner associations, the District
Court's theory is flawed on its own terms. The doctrine of
*respondeat superior*, as traditionally conceived and as under-
stood by the District Court, see *id.*, at 411, enables the impo-
sition of liability on a principal for the tortious acts of his
agent and, in the more common case, on the master for the
wrongful acts of his servant. See Restatement (Second) of
Agency §§ 215–216, 219 (1958) (Restatement); W. Prosser,
Law of Torts §§ 69–70 (4th ed. 1971) (Prosser); W. Seavey,
Law of Agency § 83 (1964) (Seavey). "Agency is the fidu-
ciary relation which results from the manifestation of consent
by one person to another that the other shall act on his behalf
and subject to his control, and consent by the other so to act."
Restatement § 1. A master-servant relationship is a form of
agency in which the master employs the servant as "an agent
to perform service in his affairs" and "controls or has the
right to control the physical conduct of the other in the per-
formance of the service." *Id.*, § 2. See 2 F. Harper &
F. James, Law of Torts § 26.6 (1956) (Harper & James).
Local 542, in its operation of the hiring hall, simply performed
no function as the agent or servant of the associations. The
record demonstrates that the associations themselves do not
hire operating engineers, and never have. Their primary
purpose is to represent certain employers in contract negotia-
tions with the Union. Even if the doctrine of *respondeat
superior* were broadly applicable to suits based on § 1981,
therefore, it would not support the imposition of liability on a
defendant based on the acts of a party with whom it had no
agency or employment relationship.[18]

_____

[18] In this case, the associations were held liable because they negotiated
an agreement, fair on its face, which was later implemented by another

We have similar difficulty in accepting the application of traditional *respondeat superior* doctrine to the class of contractor employers. In the run of cases, the relationship between an employer and the union that represents its employees simply cannot be accurately characterized as one between principal and agent or master and servant. Indeed, such a conception is alien to the fundamental assumptions upon which the federal labor laws are structured.

At the core of agency is a "fiduciary relation" arising from the "consent by one person to another that the other shall act on his behalf and subject to his control." Restatement § 1. Equally central to the master-servant relation is the master's control over or right to control the physical activities of the servant. See *id.*, § 220; 2 Harper & James § 26.3; Seavey § 84, p. 142. See also *Logue* v. *United States*, 412 U. S. 521, 527 (1973). The District Court found that the requirement of control was satisfied because "the employers retained power to oppose the union discrimination." 469 F. Supp., at 411, n. 61. However, the "power to oppose" the Union, even when the opposition is grounded in the terms of the collective-bargaining agreement, is not tantamount to a "right to control" the Union. See *Lummus Co.* v. *NLRB*, 119 U. S. App. D. C. 229, 236, 339 F. 2d 728, 735 (1964).[19]

party in a manner that was not only discriminatory but in violation of the agreement itself *and* in a manner of which the associations were neither aware nor had reason to be aware. Since the associations' only role was as agent for employers whose hiring would actually be governed by the agreement, the District Court's theory presumably would also permit the imposition of liability on the attorneys who actually conducted the contract negotiations. We are unaware of any authority supporting such an extended application of *respondeat superior*.

[19] According to respondents, the District Court's conclusion that petitioners retained the power to control the hiring hall was a finding of fact that cannot be set aside unless clearly erroneous. We disagree. The District Court found that petitioners had the "power to oppose" the Union, a conclusion we do not question. Whether the power to oppose the Union is equivalent to a right of control sufficient to invoke the doctrine of *respondeat superior* is, however, a legal question to which we must devote our independent judgment.

Indeed, a rule equating the two would convert every contractual relationship into an agency relationship, a result clearly unsupported by the common-law doctrines on which the District Court relied.

The District Court's assumptions about the relation between the Union and the class of employers with whom it has contracted also runs counter to the premises on which the federal labor laws have been constructed. While authorizing collective bargaining and providing means of enforcing the resultant contracts, the National Labor Relations Act expressly prohibits employers from compromising the independence of labor unions. See 49 Stat. 452, as amended, 29 U. S. C. § 158(a); 61 Stat. 157, as amended, 29 U. S. C. § 186. The entire process of collective bargaining is structured and regulated on the assumption that "[t]he parties—even granting the modification of views that may come from a realization of economic interdependence—still proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest." *NLRB* v. *Insurance Agents*, 361 U. S. 477, 488 (1960). See *Vaca* v. *Sipes*, 386 U. S. 171, 177 (1967). We have no reason to doubt the validity of that assumption in the instant case.

Respondents also suggest that petitioners can be held vicariously liable for the discriminatory conduct of the JATC. They argue that the JATC is properly viewed as an agent of both Local 542 and the associations, emphasizing that half of the trustees charged with administering the JATC are appointed by the associations and that the JATC is wholly funded by mandatory contributions from the employers. We note initially that the District Court premised petitioners' liability not on the actions of the JATC, but on the discriminatory conduct of the Union. See 469 F. Supp., at 411–413. The record, therefore, contains no findings regarding the relationship between the JATC and petitioners, beyond those noted above, that might support application of *respondeat superior*.

The facts emphasized by respondents, standing alone, are inadequate. That the employers fund the activities of the JATC does not render the JATC the employers' servant or agent any more than an independent contractor is rendered an agent simply because he is compensated by the principal for his services. The employers must also enjoy a right to control the activities of the JATC, and there is no record basis for believing that to be the case. Neither is a right of control inferable merely from the power of the associations to appoint half of the JATC's trustees. It is entirely possible that the trustees, once appointed, owe a fiduciary duty to the JATC and the apprentices enrolled in its programs, rather than to the entities that appointed them. Cf. *NLRB* v. *Amax Coal Co.*, 453 U. S. 322 (1981). On the assumption that *respondeat superior* applies to suits based on § 1981, there is no basis for holding either the employers or the associations liable under that doctrine without evidence that an agency relationship existed at the time the JATC committed the acts on which its own liability was premised.

## B

The District Court also justified its result by concluding that § 1981 imposes a "nondelegable duty" on petitioners "to see that discrimination does not take place in the selection of [their] workforce." 469 F. Supp., at 412.[20] The concept of a nondelegable duty imposes upon the principal not merely an obligation to exercise care in his own activities, but to answer for the well-being of those persons to whom the duty runs. See Restatement § 214. The duty is not discharged by using care in delegating it to an independent contractor. Conse-

---

[20] The court relied on Restatement § 214:

"A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty."

quently, the doctrine creates an exception to the common-law rule that a principal normally will not be liable for the tortious conduct of an independent contractor. See 2 Harper & James § 26.11, pp. 1405–1408; Prosser § 70, p. 467, § 71, p. 470. So understood, a nondelegable duty is an affirmative obligation to ensure the protection of the person to whom the duty runs.

In a sense, to characterize such a duty as "nondelegable" is merely to restate the duty. Thus, in this litigation the question is not whether the employers and associations are free to delegate their duty to abide by § 1981, for whatever duty the statute imposes, they are bound to adhere to it. The question is *what* duty does § 1981 impose. More precisely, does § 1981 impose a duty to refrain from intentionally denying blacks the right to contract on the same basis as whites or does it impose an affirmative obligation to ensure that blacks enjoy such a right? The language of the statute does not speak in terms of duties. It merely declares specific rights held by "[a]ll persons within the jurisdiction of the United States." We are confident that the Thirty-ninth Congress meant to do no more than prohibit the employers and associations in these cases from intentionally depriving black workers of the rights enumerated in the statute, including the equal right to contract. It did not intend to make them the guarantors of the workers' rights as against third parties who would infringe them. Cf. *Furnco Construction Corp.* v. *Waters,* 438 U. S. 567, 577–578 (1978) (Title VII); *Rizzo* v. *Goode,* 423 U. S. 362, 376–377 (1976) (42 U. S. C. § 1983).

Our earlier holding that § 1981 reaches only intentional discrimination virtually compels this conclusion. It would be anomalous to hold that § 1981 could be violated only by intentional discrimination and then to find this requirement satisfied by proof that the individual plaintiffs did not enjoy "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens" and that the defendants merely failed to ensure that the plaintiffs enjoyed employment op-

portunities equivalent to that of whites. Such a result would be particularly inappropriate in the case of the associations, who are not engaged in the construction business, do not employ operating engineers, and consequently did not delegate to the Union any hiring functions which they otherwise would have performed themselves. Neither the District Court nor respondents identify anything in the language or legislative history of the statute to support a contrary conclusion.[21]

## IV

In a separate portion of their brief, respondents urge several independent bases for the issuance of an injunction against the petitioners and the allocation to them of a portion of the costs of the remedial decree. Respondents first assert that the court had inherent equitable power to allocate remedial costs among all the named defendants. They also rely on the All Writs Act, 28 U. S. C. § 1651(a), as an independent basis for the injunctive portions of the District Court's order

---

[21] Respondents also contend that petitioners can be held liable on the theory that the hiring hall was a "joint enterprise" involving petitioners as well as the Union. They point to language in the District Court's opinion holding that "the union hiring hall was the agent for two principals—the union and the contractors, with their respective associations." 469 F. Supp., at 411. Even this theory, however, requires, among other things, the existence of a mutual right of control as between the members of the enterprise. See Restatement § 491; 2 Harper & James § 26.13, p. 1414. For reasons we have already stated, there is no record basis for finding that petitioners had a right to control Local 542 in its administration of the hiring hall. We also doubt the validity of the assumption that the hiring hall is a separate entity, except perhaps as a physical structure. The District Court did not find, and respondents do not assert, that the hiring hall has a separate juridical existence. Indeed, in discussing the operation of the hiring hall, the District Court made clear that it was imposing liability on the basis of *the Union's* conduct. As used in the court's opinion, the phrase "hiring hall" appears to be no more than a shorthand reference for the referral process administered on a day-to-day basis by the Union.

running against petitioners. We shall deal with these contentions in turn.

The District Court in an opinion issued after judgment set forth the basis for its holding that "defendants held injunctively liable solely under a theory of vicarious responsibility are nevertheless liable for 'a share' of the costs under Rule 54(d)." *Pennsylvania* v. *Local 542, Int'l Union of Operating Engineers*, 507 F. Supp. 1146, 1152 (1980). The District Court framed the inquiry before it as whether a party held vicariously liable to an injunction, but not for damages, might nonetheless have a proportionate share of the costs assessed against it. While this may have been an entirely appropriate frame of reference for the District Court, following its holding that petitioners were vicariously liable and therefore subject to an injunction, it is obviously not the proper frame of reference for our discussion. For the reasons previously stated, we have concluded that petitioners were not properly subject to an injunction on any of the theories set forth by the District Court. The issue before us, therefore, is whether a party not subject to liability for violating the law may nonetheless be assessed a proportionate share of the costs of implementing a decree to assure nondiscriminatory practices on the part of another party which *was* properly enjoined.

We find respondent's arguments based on the traditional equitable authority of courts to be unpersuasive. In *Milliken* v. *Bradley*, 433 U. S. 267 (1977), upon which respondents rely, and which we believe to be the case most closely in point, we expressly noted that the state petitioners had been found guilty of creating at least a portion of the constitutional violation which the order challenged in that case was designed to remedy. *Id.*, at 281–282, 289. Thus our holding there was consistent with our opinion in *Hills* v. *Gautreaux*, 425 U. S. 284 (1976), where we explained the relationship between our holding in the first *Milliken* case, *Milliken* v. *Bradley*, 418 U. S. 717 (1974), and our opinion in *Swann* v.

*Charlotte-Mecklenburg Board of Education*, 402 U. S. 1 (1971). We read these earlier decisions as recognizing "fundamental limitations on the remedial powers of the federal courts." 425 U. S., at 293. Those powers could be exercised only on the basis of a violation of the law and could extend no farther than required by the nature and the extent of that violation. *Id.*, at 293–294. This principle, we held, was not one limited to school desegregation cases, but was instead "premised on a controlling principle governing the permissible scope of federal judicial power, a principle not limited to a school desegregation context." *Id.*, at 294, n. 11.

We think that the principle enunciated in these cases, transposed to the instant factual situation, offers no support for the imposition of injunctive relief against a party found not to have violated any substantive right of respondents. This is not to say that defendants in the position of petitioners might not, upon an appropriate evidentiary showing, be retained in the lawsuit and even subjected to such minor and ancillary provisions of an injunctive order as the District Court might find necessary to grant complete relief to respondents from the discrimination they suffered at the hands of the Union. See *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 399–400 (1982). But that sort of minor and ancillary relief is not the same, and cannot be the same, as that awarded against a party found to have infringed the statutory rights of persons in the position of respondents.

The order of the District Court, insofar as it runs against petitioners, cannot be regarded as "minor" or "ancillary" in any proper sense of those terms. First, it imposes considerable burdens on the employers and associations. It directs the employers to meet detailed "minority utilization goals" in their hiring, keyed to the number of hours worked. App. to Pet. for Cert. in No. 81–280, p. 236. If they are unable to do so through referrals from Local 542, they are required to hire minority operating engineers who are not affiliated with the

Union. *Ibid.* If the goals are still not satisfied, the employers must recruit and hire unskilled minority workers from the community and provide on-the-job training. *Id.*, at 236–237. The employers are also obligated to make quarterly reports detailing the extent of their compliance with these directives. *Id.*, at 241–242. Finally, the District Court imposed on the employers and the associations a share of the financial cost incidental to enforcement of the remedial decree as a whole. *Id.*, at 252–254. See 507 F. Supp. 1146 (1980). According to petitioners, the expense of the decree in the first year of its 5-year life exceeded $200,000. See Brief for Petitioner in No. 81–280, p. 45, n. 77.

Absent a supportable finding of liability, we see no basis for requiring the employers or the associations to aid either in paying for the cost of the remedial program as a whole or in establishing and administering the training program. Nor is the imposition of minority hiring quotas directly upon petitioners the sort of remedy that may be imposed without regard to a finding of liability. If the Union and the JATC comply with the decree by training and referring minority workers, we see no reason to assume, absent supporting evidence, that the employers will not hire the minority workers referred pursuant to the collective-bargaining agreement, and employ them at wages and hours commensurate with those of nonminority workers. If experience proves otherwise, the District Court will then have more than sufficient grounds for including the employers within the scope of the remedial decree.

To the extent that the remedy properly imposed upon the Union and the JATC requires any adjustment in the collective-bargaining contract between petitioners and the Union, it is entirely appropriate for the District Court to fashion its injunctive remedy to so provide, and to have that remedy run against petitioners as well as the Union and the JATC. But the injunctive decree entered by the District Court as presently drawn treats petitioners as if they had been properly

found liable for the Union's discrimination. A decree containing such provisions, we hold, is beyond the traditional equitable limitations upon the authority of a federal court to formulate such decrees.

Nor does the All Writs Act, 28 U. S. C. § 1651(a), support the extensive liability imposed upon petitioners by the District Court. The District Court did not rely upon this Act, and we think it completely wide of the mark in justifying the relief granted by the District Court. That Act was most recently considered by this Court in *United States* v. *New York Telephone Co.*, 434 U. S. 159 (1977), where we said: "This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained . . . ." *Id.*, at 172. In *New York Telephone,* we held that the All Writs Act was available to require a third party to assist in the carrying out of a District Court order pertaining to the installation of pen registers, and in doing so we noted that "[t]he order provided that the Company be fully reimbursed at prevailing rates, and compliance with it required minimal effort on the part of the Company and no disruption to its operations." *Id.*, at 175.

An examination of our cases which have relied on the All Writs Act convinces us that respondents are simply barking up the wrong tree when they seek to support the injunctive order of the District Court against petitioners on the basis of the provisions of that Act. There was no need for the District Court to treat petitioners as strangers to this lawsuit, and therefore to rely upon some extraordinary form of process or writ to bring them before the court. Petitioners had been named as defendants by respondents in their complaint, and they litigated the injunctive liability phase of the action before the District Court. Petitioners were parties to the action in every sense of the word, and subject to the jurisdiction of the District Court both as to the imposition of liability

and as to the framing of a remedial decree. The difficulty faced by respondents in supporting the decree of the District Court insofar as it grants affirmative relief and requires payment toward the cost of implementing the decree is not that petitioners would otherwise be strangers to the action. The difficulty lies instead with the fact that on the record before the District Court the petitioners could not properly be held liable to any sort of injunctive relief based on their own conduct.

Thus insofar as respondents' arguments for the imposition of remedial obligations upon petitioners rests upon the assumption that petitioners were properly found liable for the violation of respondents' rights to be free from discrimination, that assumption can no longer stand in view of the conclusions previously set forth in this opinion. Insofar as respondents' assertions are based on some authority of the District Court to impose the sort of obligations which it did upon petitioners even though petitioners could not be held liable on the record before the District Court, we hold that such obligations can be imposed neither under traditional equitable authority of the District Court nor under the All Writs Act.[22]

---

[22] Petitioners have raised several objections to the District Court's certification of a defendant class. In light of our disposition, however, we find it unnecessary to reach these issues. It is evident from the District Court's opinion that certification of the defendant class was premised on theories of liability that made individualized questions irrelevant. See n. 5, *supra*. We have now rejected those theories, and we assume that the District Court will reconsider the issue of class certification in the event of a new trial to determine liability.

Petitioners have also questioned the standing of respondent Commonwealth of Pennsylvania to act either on its own behalf or as *parens patriae* in this litigation. We need not reach this issue either. Petitioners have not challenged the standing of the other plaintiffs and, therefore, even if Pennsylvania lacks standing, the District Court possessed Art. III jurisdiction to entertain those common issues presented by all plaintiffs. See *Watt* v. *Energy Action Educational Foundation*, 454 U. S. 151, 160 (1981); *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252,

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, concurring.

I concur in the Court's opinion today holding that a cause of action based on 42 U. S. C. § 1981 requires proof of intent to discriminate, that the employers cannot be held vicariously liable for the discrimination practiced by Local 542, and that § 1981 does not impose a "nondelegable duty" on the employers to insure that there is no discrimination in the Union's selection of the work force. I write separately, however, in order to state expressly one of the options open to the District Court on remand, and to elaborate on the Court's comments regarding the scope of the federal courts' equitable power to afford full relief.

I

In determining that the petitioners cannot be held vicariously liable for the discriminatory conduct of the JATC, the Court is careful to note that its holding is based on the failure of the trial court to make "findings regarding the relationship between the JATC and petitioners . . . that might support application of *respondeat superior.*" *Ante,* at 394.[1] In particular, because the record contains no findings regarding

---

264, n. 9 (1977). Petitioners note that Pennsylvania has sought attorney's fees in its own right, but our judgment has removed the basis for such an award against petitioners until such time as Pennsylvania can again assert status as a prevailing party. Until Pennsylvania obtains relief different from that sought by plaintiffs whose standing has not been questioned, we decline to address the Commonwealth's standing.

[1] The only facts offered by the respondents supporting application of *respondeat superior* are that half of the trustees administering the JATC are appointed by the employer associations, and that the JATC is funded entirely by mandatory employer contributions.

whether the employers maintain some control over the activities of the JATC, either through the employer-appointed trustees or through other means, the doctrine of *respondeat superior* is simply inapplicable.

I would briefly note the limits of the Court's holding. Once this case has been remanded to the District Court, nothing in the Court's opinion prevents the respondents from litigating the question of the employers' liability under § 1981 by attempting to prove the traditional elements of *respondeat superior*.

## II

Regarding the scope of a federal court's equitable powers to afford full relief, I agree with the Court's holding that "a party not subject to liability for violating the law [may not] be assessed a proportionate share of the costs of implementing a decree to assure nondiscriminatory practices on the part of another party which *was* properly enjoined." *Ante*, at 398.[2] I also agree with the Court's ancillary holding that the District Court may not require quarterly reports from the employers detailing their compliance with the court's ill-founded injunction. Of course, since the employers are not liable for general injunctive relief, such reports are unnecessary.

Under the appropriate circumstances, however, I believe other reports properly could be required of the employers, for example, to aid the court by charting the changes resulting from the injunction imposed on the Union and the JATC. Quite recently, in *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385 (1982), this Court held that § 706(g) of Title VII of the Civil Rights Act of 1964 authorizes a federal court to order retroactive seniority relief over the objections of

---

[2] In the present cases, the District Court ordered the three employer associations to pay 10% of the costs of remedial relief, and the employer, Glasgow, to pay 5%. Because the cost of relief to date has been approximately $200,000, the petitioners' share of the cost has been $70,000.

a union that was not guilty of discrimination. The Court stated:

> "*Teamsters* v. *United States*, 431 U. S. 324 (1977), . . . makes it clear that once there has been a finding of discrimination by the employer, an award of retroactive seniority is appropriate even if there is no finding that the union has also illegally discriminated. In *Teamsters*, the parties agreed to a decree which provided that the District Court would decide 'whether any discriminatees should be awarded additional equitable relief such as retroactive seniority.' *Id.*, at 331, n. 4. Although we held that the union had not violated Title VII by agreeing to and maintaining the seniority system, we nonetheless directed the union to remain in the litigation as a defendant so that full relief could be awarded the victims of the employer's post-Act discrimination. *Id.*, at 356, n. 43." *Id.*, at 400.[3]

As the Court acknowledges today, it is entirely possible that full relief cannot be granted without subjecting the petitioners to some incidental or ancillary provisions of the court's injunctive order. It is thus conceivable, for example, that quarterly reports providing employment statistics necessary for the court to ascertain whether its injunctive decree is being properly implemented could be ordered under the court's equitable powers to effectuate its decree.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

As I noted in my separate opinion in *Runyon* v. *McCrary*, 427 U. S. 160, 189, the Congress that enacted § 1 of the Civil

---

[3] In support of this statement, the Court in *Teamsters* cited Rule 19(a)(1) of the Federal Rules of Civil Procedure, which requires a district court to join a person as a party if "in his absence complete relief cannot be accorded among those already parties."

Rights Act of 1866 "intended only to guarantee all citizens the same legal capacity to make and enforce contracts, to obtain, own, and convey property, and to litigate and give evidence." Any violation of that guarantee—whether deliberate, negligent, or purely accidental—would, in my opinion, violate 42 U. S. C. § 1981. The statute itself contains no requirement that an intent to discriminate must be proved.

The Court has broadened the coverage of § 1981 far beyond the scope actually intended by its authors; in essence, the Court has converted a statutory guarantee of equal rights into a grant of equal opportunities. See *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409; *Runyon* v. *McCrary, supra.* Whether or not those decisions faithfully reflect the intent of Congress, the enlarged coverage of the statute "is now an important part of the fabric of our law." *Runyon, supra,* at 190 (STEVENS, J., concurring).

Since I do not believe Congress intended § 1981 to have any application at all in the area of employment discrimination generally covered by Title VII of the Civil Rights Act of 1964, an analysis of the motives and intent of the Reconstruction Congress cannot be expected to tell us whether proof of intentional discrimination should be required in the judicially created portion of the statute's coverage. Since Congress required no such proof in the statute it actually enacted, a logician would be comfortable in concluding that no such proof should ever be required. Nevertheless, since that requirement tends to define the entire coverage of § 1981 in a way that better reflects the basic intent of Congress than would a contrary holding, I concur in the conclusion reached by the Court in Part II of its opinion insofar as it relates to the statutory protection of equal opportunity but, perhaps illogically, would reach a different conclusion in a case challenging a denial of a citizen's civil rights.

Accordingly, I join the Court's judgment and Parts III and IV of its opinion.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Today the Court reaches out and decides that 42 U. S. C. § 1981 requires proof of an intent to discriminate—an issue that is not at all necessary to the disposition of these cases. Because I find no support for the majority's resolution of this issue, and because I disagree with its disposition of these cases even if proof of intent should ordinarily be required, I respectfully dissent.

I

The question whether intent generally should be required in § 1981 actions is at most tangentially related to these cases. There was unquestionably intentional discrimination on the part of both the union (Local 542) and the Joint Apprenticeship and Training Committee (JATC), a body composed of officials from the union and the petitioner contracting associations, which jointly administered the apprenticeship and training program. As a result, the only question that the Court need address today is whether limited injunctive liability may be vicariously imposed upon an employer when the person or entity to whom it delegates a large portion of its hiring decisions intentionally discriminates on the basis of race. However, because the majority has chosen to reach first the more general question whether proof of intent is a prerequisite to recovery in a § 1981 action, I likewise will address this issue first.

Section 1981 provides in unqualified terms:

> "All persons within the jurisdiction of the United States *shall have the same right* in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U. S. C. § 1981.

The plain language does not contain or suggest an intent requirement. A violation of § 1981 is not expressly conditioned on the motivation or intent of any person. The language focuses on the effects of discrimination on the protected class, and not on the intent of the person engaging in discriminatory conduct. Nothing in the statutory language implies that a right denied because of sheer insensitivity, or a pattern of conduct that disproportionately burdens the protected class of persons, is entitled to any less protection than one denied because of racial animus.

The Court attaches no significance to the broad and unqualified language of § 1981. Furthermore, the majority finds no support for its conclusion that intent should be required in the legislative history to § 1 of the 1866 Act, the precursor to § 1981. Instead, in the face of this unqualified language and the broad remedial purpose § 1981 was intended to serve, the majority assumes that Congress intended to restrict the scope of the statute to those situations in which racial animus can be proved on the ground that the legislative history contains no "convincing evidence" to the contrary. *Ante*, at 391. In my view, this approach to statutory construction is not only unsound, it is also contrary to our prior decisions, which have consistently given § 1981 as broad an interpretation as its language permits. See, *e. g., McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273 (1976); *Runyon* v. *McCrary*, 427 U. S. 160 (1976); *Johnson* v. *Railway Express Agency, Inc.*, 421 U. S. 454 (1975); *Tillman* v. *Wheaton-Haven Recreation Assn.*, 410 U. S. 431 (1973); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969); *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968).

The fallacy in the Court's approach is that, in construing § 1981 and its legislative history, the Court virtually ignores Congress' broad remedial purposes and our paramount national policy of eradicating racial discrimination and its pernicious effects. When viewed in this light, it is clear that proof of intentional discrimination should not be required in order to find a violation of § 1981.

Although the Thirty-ninth Congress that passed the Civil Rights Act of 1866 did not specifically address the question whether intent should be required, the conclusion is inescapable that the congressional leadership intended to effectuate "the *result* of a change from a centuries old social system based on involuntary labor, with all the notions of racial unsuitability for the performance of anything but menial labor under close supervision, to the free labor system." *Croker* v. *Boeing Co.*, 662 F. 2d 975, 1006 (CA3 1981) (Gibbons, J., with whom Higginbotham and Sloviter, JJ., joined, dissenting in part) (emphasis in original). When this Congress convened, the Thirteenth Amendment had been ratified, abolishing slavery as a legal status. However, it was clear that in reality, Negroes were hardly accorded the employment and other opportunities accorded white persons generally. Thus, this Congress undertook to provide *in fact* the rights and privileges that were available to Negroes in theory. See generally J. tenBroek, The Antislavery Origins of the Fourteenth Amendment 156–180 (1951) (discussing the intent of the Thirty-ninth Congress to ensure to Negroes the *practical* freedom and equality which was already present at law, to reach private, not merely governmental conduct, and to provide affirmative obligations on the government to protect Negroes from unequal treatment). Four separate but related measures were proposed in an effort to accomplish this purpose.[1]

In this general climate, the 1866 Civil Rights Act was not an isolated technical statute dealing with only a narrow subject. Instead, it was an integral part of a broad congressional scheme intended to work a major revolution in the pre-

---

[1] These measures included the Civil Rights Act of 1866, passed over President Johnson's veto; the Freedman's Bureau bill, which would have created a federal agency to ensure that a free labor system in which Negroes had equal participation would *in fact* be accomplished, and which commanded a clear majority in Congress, but failed to pass over a Presidential veto; a constitutional amendment sponsored by Representative Bingham but not recommended; and the Fourteenth Amendment.

vailing social order.[2]   It is inconceivable that the Congress which enacted this statute would permit this purpose to be thwarted by excluding from the statute private action that concededly creates serious obstacles to the pursuit of job opportunities by Negroes solely because the aggrieved persons could not prove that the actors deliberately intended such a result.   Even less conceivable is the notion, embraced by the Court's opinion today, that this Congress intended to absolve employers from even injunctive liability imposed as a result of intentional discrimination practiced by the persons to whom they had delegated their authority to hire employees.   See *infra*, at 414–418.

The legislative history demonstrates that the Thirty-ninth Congress intended not merely to provide a remedy for preexisting rights, but to eradicate the "badges of slavery" that remained after the Civil War and the enactment of the Thirteenth Amendment.   Congress was acutely aware of the difficulties that federal officials had encountered in effectuating

---

[2] As the majority recognizes, *ante*, at 386–387, one of the principal changes Congress hoped to achieve was the elimination of the infamous Black Codes.   These included state laws regulating the terms and conditions of employment.   In many States, these oppressive laws were facially neutral, literally applying to all laborers without regard to race.   The laws prohibited such conduct as refusing to perform work and disobeying an employer, or inducing an employee away from his employer, and many provided for forfeiture of wages if the employee did not fulfill the terms of his employment contract.   Other Codes included vagrancy laws, which were vague and broad enough to encompass virtually all Negro adults, and many were facially neutral, applying to white persons as well as to Negroes. See *Croker* v. *Boeing Co.*, 662 F. 2d 975, 1004, n. 5 (CA3 1981) (Gibbons, J., dissenting in part) (citing E. McPherson, Political History of the United States of America During the Period of Reconstruction 30–44 (1871)).   The Black Codes were constantly discussed during the debates over the Civil Rights Act of 1866, and Congress clearly intended that the Act would eliminate even those Codes which were facially neutral.   See, *e. g.*, Cong. Globe, 39th Cong., 1st Sess., 39–41, 118–125 (1865); *id.*, at 1151–1160, 1838–1839 (1866).   See also *University of California Regents* v. *Bakke*, 438 U. S. 265, 390–391 (1978) (separate opinion of MARSHALL, J.).

the change from the system of slavery to a system of free labor even though the legal and constitutional groundwork for this change had already been laid. In the report that formed the working paper for the Joint Committee on Reconstruction and was of central importance to the deliberations of the Thirty-ninth Congress, General Schurz noted:

> "That the result of the free labor experiment made under circumstances so extremely unfavorable should at once be a perfect success, no reasonable person would expect. Nevertheless, a large majority of the southern men with whom I came into contact announced their opinions with so positive an assurance as to produce the impression that their minds were fully made up. In at least nineteen cases of twenty the reply I received to my inquiry about their views on the new system was uniformly this: 'You cannot make the negro work without physical compulsion.' I heard this hundreds of times, heard it wherever I went, heard it in nearly the same words from so many different persons, that at last I came to the conclusion that this is the prevailing sentiment among the southern people. There are exceptions to the rule, but, as far as my information extends, far from enough to affect the rule. In the accompanying documents you will find an abundance of proof in support of this statement. There is hardly a paper relative to the negro question annexed to this report which does not, in some direct or indirect way, corroborate it." S. Exec. Doc. No. 2, 39th Cong., 1st Sess. (1865), reprinted in The Reconstruction Amendments' Debates 88 (Virginia Comm'n on Constitutional Government, 1967).

Fully aware of this prevailing attitude, the leaders of Congress set about to enact legislation that would ensure to Negroes the opportunity to participate equally in the free labor system by providing an instrument by which they could strike down barriers to their participation, whether those

barriers were erected with the conscious intent to exclude or with callous indifference to exclusionary effects. Congress knew that this attitude could manifest itself in a number of different ways and intended to protect Negro workers against not only flagrant, intentional discrimination, but also against more subtle forms of discrimination which might successfully camouflage the intent to oppress through facially neutral policies. Congressional awareness of the potential role that facially neutral measures might play in impeding the ability of Negroes to enjoy equal job opportunities is also reflected in the working paper which formed the basis for the 1866 Act. Addressing this problem, General Schurz stated:

> "What particular shape the reactionary movement will assume it is at present unnecessary to inquire. There are a hundred ways of framing apprenticeship, vagrancy, or contract laws, which will serve the purpose . . . ." *Id.*, at 92.

Unfortunately, this awareness seems utterly lacking in the Court's opinion today. In order to hold that § 1981 requires a showing of intent, the majority must assume that the rights guaranteed under § 1981—to make and enforce contracts on the same basis as white persons—can be adequately protected by limiting the statute to cases where the aggrieved person can prove intentional discrimination. In taking this extraordinarily naive view, the Court shuts its eyes to reality, ignoring the manner in which racial discrimination most often infects our society. Today, although flagrant examples of intentional discrimination still exist, discrimination more often occurs "on a more sophisticated and subtle level," the effects of which are often as cruel and "devastating as the most crude form of discrimination." *Pennsylvania* v. *Local 542, Int'l Union of Operating Engineers*, 469 F. Supp. 329, 337 (ED Pa. 1978) (Higginbotham, Circuit Judge, sitting by designation).[3] I think that Judge Higginbotham most accu-

---

[3] When discussing the scope of the Fifteenth Amendment in 1939, Justice Frankfurter was sensitive to the subtle forms that racial discrimination

rately recognized this problem when he noted that "[t]he facts of the instant case . . . demonstrate the complexity and subtlety of the interrelationship of race, collective bargaining, craft unions, the employment process and that ultimate goal—real jobs." *Ibid.* He further noted that "[a]t the critical level of viable jobs and equal opportunities, there were intentional and persistent efforts to exclude and discourage most of the minorities who, but for their race, would have been considered for entry into the union and for the more lucrative jobs." *Ibid.*

Racial discrimination in all areas, and particularly in the areas of education and employment, is a devastating and reprehensible policy that must be vigilantly pursued and eliminated from our society:

> "Racial discrimination can be the most virulent of strains that infect a society, and the illness in any society so infected can be quantified. Exposure to embarrassment, humiliation, and the denial of basic respect can and does cause psychological and physiological trauma to its victims. This disease must be recognized and vigorously eliminated wherever it occurs. But racial discrimination takes its most malevolent form when it occurs in employment, for prejudice here not only has an immediate economic effect, it has a fulminating integrant that perpetuates the pestilences of degraded housing, unsatisfactory neighborhood amenities, and unequal education." *Croker* v. *Boeing Co.*, 662 F. 2d, at 1002 (Aldisert, J., with whom Higginbotham, J., joined, dissenting in part).

The purposes behind § 1981, and the profound national policy of blotting out all vestiges of racial discrimination, are no less frustrated when equal opportunities are denied through clev-

---

often takes. Writing for the Court in *Lane* v. *Wilson*, 307 U. S. 268, 275, he stated: "The Amendment nullifies sophisticated as well as simple-minded modes of discrimination." Unfortunately, the Court no longer seems sensitive to this reality.

erly masked or merely insensitive practices, where proof of actual intent is nearly impossible to obtain, than when instances of intentional discrimination escape unremedied. For this reason, I cannot accept the Court's glib and unrealistic view that requiring proof of intent in § 1981 actions does not frustrate that statute's purpose of protecting against the devastating effects of racial discrimination in employment.

## II

Even if I agreed with the Court that intent must be proved in a § 1981 action, I could not agree with its conclusion that the petitioner contracting associations should be immunized, even from injunctive liability, for the intentional discrimination practiced by the union hall to which they delegated a major portion of their hiring decisions.   Under § 1981, minorities have an unqualified right to enter into employment contracts on the same basis as white persons.   It is undisputed that in these cases, the respondent class was denied this right through intentional discrimination.   The fact that the associations chose to delegate a large part of the hiring process to the local union hiring hall, which then engaged in intentional discrimination, does not alter the fact that respondents were denied the right to enter into employment contracts with the associations on the same basis as white persons.

At the very least, § 1981 imposes on employers the obligation to make employment decisions free from racial considerations.   The hiring decisions made by the contracting associations in these cases were fraught with racial discrimination. Solely because of their race, hundreds of minority operating engineers were totally excluded from the industry and could not enter into employment contracts with any employer. Those minorities allowed into the industry suffered discrimination in referrals, and thus they too were denied the same right as white persons to contract with the contracting associations.   Not one of the petitioner contracting associations has ever claimed, nor could they, that minorities had

the same right as white operating engineers to contract for employment.

Instead, the contracting associations attempt to hide behind the veil of ignorance, shifting their responsibility under § 1981 to the very entity which they chose to assist them in making hiring decisions.[4] The suggestion that an employer's responsibility under § 1981 depends upon its own choice of

---

[4] Although the District Court held that respondents had not proved that the contracting associations as a class had actual knowledge or had specifically approved of the intentional discrimination, it hardly found them totally blameless in this regard, and it found that the petitioner associations in particular were not innocent. One part of the proof of intentional discrimination by the hiring hall was the fact that Local 542 had intentionally overstated its percentage of minority members to the Federal Government in order to receive federal funds while maintaining an extraordinarily low actual minority percentage. With respect to the petitioner contracting associations, the District Court found:

"Any argument that, because the union alone had primary access to the membership data, the [petitioner] contracting associations . . . were not at least reckless participants in this scheme, I find to be devoid of merit and patently incredible. . . . The prospect of deriving . . . an immediate and substantial financial benefit from the federal coffers allowed them to become willing parties to the scheme by capriciously certifying 'facts' in anticipation of the government's reliance on them: Having sought to enrich their members with substantial profits, it is now too late to cry innocence and cast the blame elsewhere. These were no innocent prognosticators who were misled by the union's scheme to give inaccurate information." *Pennsylvania* v. *Local 542, Int'l Union of Operating Engineers,* 469 F. Supp. 329, 345 (ED Pa. 1978).

The District Court further found:

"The fact is that the vast majority of individual contractors *never hired* a minority operating engineer; that the [petitioner associations] signed a statement, relevant to federal approval of the 'Affirmative Action Program' . . . , grossly exaggerating minority union membership; and that the gross disparity between the percentage of the minority representation in the labor pool and minority representation in the union along with a gross disparity in hours and wages of minorities as against the minority labor pool percentage is a matter of such broad scope that some or all of the contractors and associations might have had knowledge of it." *Id.,* at 401 (emphasis added).

a hiring agent finds no support in the statute, nor does any other source of law authorize the circumvention of § 1981 that the contracting associations seek here. Their obligation to make employment contracts free from racial discrimination is a nondelegable one—it does not disappear when, as is often the case, the actual employer designates a particular agent to assist in the hiring process. In my view, the fact that the discriminating entity here is a union hiring hall, and not a person or corporation which has a traditional agent-principal relationship with the employer, does not alter this analysis. Cf. *Morrison-Knudsen Co.* v. *NLRB*, 275 F. 2d 914 (CA2 1960) (per Swan, J.) (employer cannot escape liability for discrimination against nonunion members by the union hiring hall to which it turns over the task of supplying men for employment), cert. denied, 366 U. S. 909 (1961).

The majority does not really analyze the question whether petitioners should be held injunctively liable because § 1981 imposes upon them a nondelegable duty. Instead the majority argues that, because it has held that § 1981 is intended only to reach intentional discrimination, the statute cannot make employers "guarantors of the workers' rights as against third parties who would infringe them." *Ante*, at 396. This argument does not withstand analysis. The majority does not assert that employers may escape liability under § 1981 by delegating their hiring decisions to a third-party agent. Indeed, in light of the importance attached to the rights § 1981 is intended to safeguard, the duty to abide by this statute must be nondelegable, as the majority apparently recognizes. *Ante*, at 396. Instead, the majority argues that because § 1981 imposes only the duty to refrain from intentional discrimination in hiring, it somehow automatically follows that this duty could not have been violated in this case. However, it was precisely this duty that was violated here. The District Court found, and this Court does not disagree, that the entity to whom the petitioner associations effectively delegated their hiring decisions *intentionally discriminated* against the respondent class on the basis of race in making

these decisions. Even under the Court's own narrow view of the scope of the duty imposed by § 1981, then, the duty was unquestionably violated in these cases.

The majority obfuscates the issue by suggesting that the District Court imposed upon the contracting associations an obligation to seek out and eliminate discrimination by unrelated third parties wherever it may occur. In reality, the District Court did nothing more than impose limited injunctive liability upon the associations for violating their nondelegable duty under § 1981 when the union hiring hall, which effectively made hiring decisions for the associations, engaged in intentional discrimination on the basis of race in making these decisions.

By immunizing the employer from the injunctive relief necessary to remedy the intentional discrimination practiced by those through whom the employer makes its hiring decisions, the Court removes the person most necessary to accord full relief—the entity with whom the aggrieved persons will ultimately make a contract. I believe that the District Court appropriately rejected the petitioners' argument when it explained: "With intensity some employers urge that they agreed to the exclusive hiring hall system solely as a matter of economic survival at the end of a destructive ten week strike when the union would not compromise for any other hiring alternative. Yet economic pressures, however strong and harmful they might be, do not create immunity for employers, at least not in [the injunctive] liability phase." 469 F. Supp., at 338.

Section 1981 provides Negroes "the same right" to make contracts as white persons enjoy. In the present cases, this unqualified right was violated, and the violation is made no more palatable because the persons who actually made the hiring decisions and referrals, and not the employer itself, engaged in intentional discrimination.[5] The devastating vi-

---

[5] I agree with JUSTICE O'CONNOR's observation that nothing in the Court's opinion prevents the District Court on remand from holding the pe-

olation of their rights under § 1981 remains the same and will go at least partially unremedied when the person with whom the ultimate employment contract must be made is immunized from even injunctive relief. I cannot impute to the Congress which enacted § 1981 the intention to reach such an inequitable and nonsensical result. Accordingly, I must dissent.

---

titioner associations liable for discrimination practiced by the JATC. Specifically, they may be held liable because the trustees administering the JATC are appointed by the petitioner associations, the JATC is funded by employer contributions, and the associations exercise control over the JATC's actions. I also agree with JUSTICE O'CONNOR that the Court's opinion does not prevent the District Court from requiring petitioners to comply with incidental or ancillary provisions contained in its injunctive order.