## ULTIMAX TRANSPORTATION, INC., Plaintiff,

### v.

## BRITISH AIRWAYS, PLC, Defendant.

### No. CIV.A.1:01–CV–0361–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2002.

John D. Wales and Barbara M. Heyne, Office of John D. Wales, Atlanta, GA, for Plaintiff.

James D. Johnson and C. Bradford Marsh, Swift Currie McGhee & Heirs, Atlanta, GA, for Defendant.

### ORDER

CARNES, District Judge.

The above-captioned action is before the Court on defendant's Motion for Summary Judgment [20] and defendant's Motion to Strike Affidavits of Michael Wright, Grant Steele, Demetrius Johnson, and Jo–Ann Saunders [27]. The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that defendant's Motion to Strike Affidavits of Michael Wright, Grant Steele, Demetrius Johnson, and Jo–Ann Saunders [27] should be **GRANTED IN PART**, and defendant's Motion for Summary Judgment [20] should be **DENIED**.

### FACTS

This is an action for race discrimination in the formation of contracts pursuant to 42 U.S.C. § 1981. Plaintiff Ultimax Transportation, Inc., filed the Complaint [1] in this action on February 7, 2001, alleging that defendant British Airways PLC terminated its oral contract with plaintiff and refused to enter into another contract with plaintiff because plaintiff is owned and operated by African–Americans[1] and is staffed primarily with African–American employees.

Unless otherwise indicated, the Court draws the undisputed facts from "Defendant British Airways PLC's Local Rule 56B Statement of Material Facts to Which There is No Genuine Issue to Be Tried" ("SMF") [20]. If, however, plaintiff has disputed any of those facts, the Court has

---

1. Plaintiff is making a race claim. Hence, the term "African–American" does not reference a national origin claim or group, but instead refers to persons whose race is black. Ac-cordingly, the terms "African–American" and "black" are used interchangeably. The terms "white" and "Caucasian" are likewise used interchangeably.

viewed all evidence and factual inferences in the light most favorable to plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir.1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir.1993). Accordingly, the following facts are viewed in the light most favorable to plaintiff, and are assumed true only for the purposes of this discussion.

Defendant British Airways PLC ("British Airways") operates an international passenger airline that does business at Hartsfield International Airport ("Hartsfield") outside Atlanta, Georgia. (*See* Compl. at ¶¶ 11–13.) Plaintiff Ultimax Transportation, Inc. ("UTI") is a Georgia corporation that operates a baggage delivery service at Hartsfield and also provides passenger pick-ups and limited cargo services. (*Id.* at ¶ 12–13.) Keith Burwell ("Burwell"), an African–American, is the President, Chief Executive Officer ("CEO"), and sole shareholder of UTI; UTI is also staffed primarily by African–American employees. (*Id.* at ¶¶ 14–15; SMF at ¶ 2.)

In 1996, Ronnie Jennings ("Jennings"), the Service Delivery Manager for British Airways at Hartsfield, made the decision to allow UTI to deliver some of the mishandled luggage for British Airways at Hartsfield.[2] (SMF at ¶ 5.) UTI thereafter delivered mishandled luggage for British Airways from June, 1996, through January, 1999. (*Id.* at ¶ 3.) There was never any written contract or agreement between the parties regarding the luggage delivery services. (*See id.* at ¶ 9; plaintiff's response to SMF [24] at ¶ 9.) Accord-

ing to Burwell, however, there was a "verbal okay" for plaintiff's employees to enter the offices of defendant in order to take its mishandled luggage for delivery to passengers. (Pl.'s Resp. to SMF [24] at ¶ 9.) Throughout that same time period that UTI was performing luggage delivery services for British Airways, another company, Atlanta Baggage Express ("ABE") also delivered mishandled luggage for defendant. (*Id.* at ¶ 4.)

At some point prior to February, 1999, British Airways employees informed employees of UTI that defendant was dissatisfied with the quality of services performed by plaintiff. (*Id.* at ¶ 6.) In approximately February, 1999, Jennings decided that British Airways would no longer use the services of UTI for luggage delivery. (*Id.* at ¶ 5.) Jennings contends that he based his decision on reports made to him of passenger complaints regarding untimely deliveries by UTI. (*Id.* at ¶ 7.)

According to UTI, it was the general "policy" throughout Hartsfield that the first baggage delivery service to call on an airline would get the bags that needed to be delivered. (Plaintiffs' Statement of Material Facts ["Pls. SMF"] [24] at ¶ 2; Wright Aff. at ¶ 5.) UTI employees routinely went to the baggage area of British Airways to ask whether any mishandled luggage needed to be delivered, but, according to these employees, on many occasions British Airways employees told them there no bags to be delivered. (*See* Pls. SMF at ¶¶ 1, 3–5, 7.) UTI employee Michael Wright states that approximately 75 percent of the time he called on British Airways for luggage, he was informed by its employees that there was no luggage to be delivered. (*Id.* at ¶ 3; Wright Aff. at

---

**2.** "Mishandled" luggage is luggage that is mis-directed at some point during a scheduled airline journey, but is later recovered by the airline; thus, upon recovery of the luggage, it usually must be delivered to its owner who has long since left the airport.

¶ 6.) Later, however, he would witness ABE employees taking luggage away from British Airways. (Pls. SMF at ¶ 3; Wright Aff. at ¶ 7.) According to Wright, most of the ABE employees he saw were Caucasian. (Wright Aff. at ¶ 8; Pls. SMF at ¶ 9.)

Grant Steele worked for UTI on a part-time basis in 1998, and he also states that he routinely went to the British Airways baggage area to ask whether any mishandled baggage needed to be delivered. (Steele Aff. at ¶¶ 3–4.) According to Steele, British Airways employees would refuse to give him bags to deliver because they informed him that ABE had already been called to deliver the bags, although Steele did not see any ABE tags on the bags to indicate that they were marked for delivery by ABE. (Pls. SMF at ¶ 4; Steele Aff. at ¶ 5.) On one occasion, Steele saw that bags had just arrived from a flight and a new British Airways employee was giving Steele the bags for delivery to passengers. (Pls. SMF at ¶ 5; Steele Aff. at ¶ 6.) Before Steele could take the bags away to be delivered however, another British Airways employee said that he could not have the bags because they had "already been written up for delivery by ABE." (Pls. SMF at ¶ 5; Steele Aff. at ¶ 6.) According to Steele, "I did not understand how these bags could have been already written up for ABE when they had just come in." (Steele Aff. at ¶ 7; Pls. SMF at ¶ 5.)

Steele further contends that, on the few occasions that British Airways gave him mishandled bags to deliver, he knew that ABE employees were busy elsewhere in the airport. (Pls. SMF at ¶ 6; Steele Aff. at ¶ 8.) He also contends that three of the four ABE employees who worked the same shift that he worked were Caucasian. (Pls. SMF at ¶ 9; Steele Aff. at ¶ 9.)

Demetrius Johnson worked for UTI on a full-time basis as a night dispatcher during 1998 and 1999. (Johnson Aff. at ¶ 3.) According to Johnson, he also routinely went to the British Airways baggage area to inquire about mishandled bags that needed delivery, but although he could see bags that needed to be delivered, he was told by British Airways employees that there no bags to be delivered. (Pls. SMF at ¶ 7; Johnson Aff. at ¶¶ 4–6.) On other occasions, when he did not see any bags that needed delivery, he would "wait around" and soon afterwards he would see ABE employees coming out of the British Airways baggage area with bags. (Pls. SMF at ¶ 7; Johnson Aff. at ¶ 7.) On the few occasions that British Airways gave him bags to deliver, Johnson states that he knew that ABE was busy elsewhere in the airport. (Pls. SMF at ¶ 8; Johnson Aff. at ¶ 8.) Of the nine or ten ABE employees who worked the night shift at Hartsfield during the time he was employed by UTI, Johnson states that "six or seven" were Caucasian. (Johnson Aff. at ¶ 9; Pls. SMF at ¶ 9.)

Jo–Ann Saunders worked for British Airways as a customer service agent from August, 1998, to May, 1999, during which time one of her responsibilities was arranging for baggage deliveries. (Pls. SMF at ¶ 11; Saunders Aff. at ¶¶ 3–4.) On one occasion, Saunders was in the supply room behind the ticket counter when she overheard another British Airways employee, Pete Tamburello, say to a Caucasian employee of ABE that "when they [British Airways] get their bags delivered by Ultimax, the bags will smell like fried chicken." (Pls. SMF at ¶ 12; Saunders Aff. at ¶ 5.) She interpreted that comment as a racial slur against African–Americans, based on a racial stereotype that all African–Americans eat fried chicken. (Pls. SMF at ¶ 14; Saunders Aff. at ¶ 8.) Saunders states that Tamburello did not know

she was in the room when he made that statement and when he saw her, "his face turned red and he turned away from me." (Pls. SMF at ¶ 12; Saunders Aff. at ¶ 6.)

According to Saunders, Tamburello was the person at British Airways who decided which baggage delivery service to use. (Pls. SMF at ¶ 13; Saunders Aff. at ¶ 7.) She states that it was the normal procedure that mishandled bags that needed delivery were tagged with "Baggage Delivery Orders" ("BDO's"). (Pls. SMF at ¶ 15; Saunders Aff. at ¶ 9.) Saunders observed Tamburello take bags labeled with BDO's marked "universal" and replace the tags with BDO's marked "ABE." (Pls. SMF at ¶ 15; Saunders Aff. at ¶ 9.) Saunders contends that, in her experience, UTI employees inquired more frequently about baggage deliveries than did ABE employees, and UTI's delivery times were faster than those of ABE. (Pls. SMF at ¶ 16; Saunders Aff. at ¶ 10.)

Keith Burwell, President and CEO of UTI, states that Ronnie Jennings, the British Airways Service Manager, told him that UTI employees who were unable to get in touch with a British Airways passenger in order to schedule a baggage delivery should call a toll-free "1–800" number to inform British Airways. (Pls. SMF at ¶ 17; Burwell Dep. at 86–88.) According to Burwell, although Jennings informed him that the phone number had voice mail capacity "after hours," the number had no voice mail capacity. (Pls. SMF at ¶ 17; Burwell Dep. at 88.) Burwell also states that he monitored UTI's performance for baggage deliveries for British Airways, and UTI had no late deliveries. (Pls. SMF at ¶ 18; Burwell Dep. at 109.) Burwell further contends that Jennings told him that UTI's services were as good as, if not better than, ABE's services with respect to speed and efficiency. (Pls. SMF at ¶ 19; Burwell Dep. at 119.)

It is undisputed that no member of management at British Airways ever said anything to Burwell indicating any racial animus towards African–Americans. (SMF at ¶ 8.)

Plaintiff filed the Complaint [1] that initiated the instant action on February 7, 2001, asserting a claim against British Airways for racial discrimination under 42 U.S.C. § 1981. After multiple extensions of the discovery period, discovery ended on January 14, 2002, and on February 4, 2002, defendant filed a Motion for Summary Judgment [20], which is now pending before the Court. In connection with its response to defendant's motion [24], plaintiff filed the supporting affidavits of Michael Wright, Grant Steele, Demetrius Johnson, and Jo–Ann Saunders. On April 12, 2002, defendant filed a Motion to Strike those Affidavits [27], which motion is also pending before the Court.

## DISCUSSION

### I. Motion to Strike Affidavits

 Defendant has filed a Motion to Strike the Affidavits of Michael Wright, Grant Steele, Demetrius Johnson, and Jo–Ann Saunders [27], which affidavits plaintiff filed in connection with its brief in response [24] to defendant's Motion for Summary Judgment. Defendant argues that these affidavits should be struck from the record because the affiants have not shown affirmatively that they have personal knowledge of all the information contained in the affidavits, and because the affidavits are "filled with conjecture, speculation and unsupported 'facts.'" (Def.'s Motion to Strike [27] at 2.) Plaintiff argues that defendant's objections to the affidavits relate to the credibility of the affiants or the weight that should be given to the affidavits, and, therefore, those matters are for consideration by the jury and the

affidavits should not be stricken from the record.

The Court agrees with the plaintiff, in part, that much of defendant's objections relate to the credibility of the affiants and the weight that the affidavits should be accorded. For example, Grant Steele states in his affidavit that, "[o]f the four ABE employees who work the same shifts as I did, three were Caucasian." (Steele Aff. at ¶ 9.) Defendant moves that this statement be struck, because it "is not evidence of the racial makeup of ABE. It is simply a non-reliable, anecdotal statement regarding affiant's limited knowledge of ABE employees." (Def.'s Motion to Strike [27] at 3.) Thus, defendant's objection is that the affiant's testimony should not be given much weight because it is "non-reliable" and "anecdotal" and because the affiant has "limited knowledge." Defendant's objection relates solely to the credibility of the affiant and the weight that the testimony should be given, and does not provide a basis for striking the affidavit from the record.

Defendant also objects to many other statements in the affidavits that are based on the affiants' personal observation and experience, on the grounds that such statements are "unsupported" or are "unreliable" as evidence. Many of the affiants' statements are clearly based solely on their personal observations, and thus may be considered "anecdotal" and perhaps "limited" in their application to the ultimate issues in this action, but that does not render the evidence inadmissible. The Court concludes that these objections all concern the appropriate weight that should be afforded the testimony, which is a question strictly within the province of the jury. This Court may not weigh the evidence and evaluate the credibility of the witnesses at the summary judgment stage. Furthermore, with respect to those state-ments included in the affidavits that are not probative of any of the issues that are material to this action, or are not relevant, they will not be considered by the Court.

■ Defendant further objects to a statement contained in several of the affidavits at issue, in which each affiant states "I believe that British Airways refused to use UTI's services because it is an African American company." (*See* Wright Aff. at ¶ 9; Steele Aff. at ¶ 10; Johnson Aff. at ¶ 10.) Defendant objects to these statements because they are conclusory and not based upon personal knowledge. The Court agrees with defendant. The affiants have not provided any facts based on their personal knowledge that would support such a "belief" about the motives of the management of British Airways. Furthermore, an affiant's personal "belief" about the motives of the defendant's employees is not relevant or probative evidence of any of the material issues in this action, and such conclusory statements are therefore not admissible as evidence to defeat a motion for summary judgment. Accordingly, these statements shall be struck and shall not be considered by the Court in resolving defendant's Motion for Summary Judgment.

Defendant's Motion to Strike the Affidavits of Michael Wright, Grant Steele, Demetrius Johnson, and Jo–Ann Saunders [27] is thus **GRANTED IN PART, DENIED IN PART**. The Motion is **DENIED** except for the statements of the affiants related to their "belief" that British Airways refused to use UTI's services because it is an African–American company. All statements in the affidavits to that effect are struck and will not be considered by the Court. Further, to the extent that any other such statements exist, the Court has not considered them.

## II. *Motion for Summary Judgment*

### A. *Summary Judgment Standard*

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). The movant is not required to negate his opponent's claim, however. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence, including affidavit and deposition testimony, answers to interrogatories, and other such evidence, designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting FED. R. CIV. P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

### B. *Plaintiff's Section 1981 Claim*

Defendant has moved for summary judgment on plaintiff's claim of race discrimination under 42 U.S.C. § 1981 ("Section 1981"). Section 1981 provides, in pertinent part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full

and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, liens, and exactions of every kind, and to no other. (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Plaintiff has asserted a claim against defendant under Section 1981 for the "denial and impediment of Plaintiff's right to make and enforce contracts because of race." (Compl. at ¶ 2.) Plaintiff further alleges that defendant "has engaged in a pattern of race discrimination against Plaintiff." (*Id.* at ¶ 3.) The gravamen of plaintiff's claim is that, after February, 1999, defendant refused to continue an ongoing verbal agreement with UTI for baggage delivery services, and instead chose to enter into an exclusive agreement with ABE, because UTI is owned and operated by African–Americans, and staffed primarily with African–American employees, while competitor ABE is staffed primarily with Caucasian employees. Plaintiff contends that it provided satisfactory baggage delivery services to defendant under an ongoing oral agreement from 1996 to January, 1999, and the reason that defendant ceased doing business with plaintiff after January, 1999, was based on the race of its owner and President and the race of most of its employees, and is not the result of poor performance or untimely baggage deliveries by plaintiff.

A Section 1981 action must be based on intentional racial discrimination that affects at least one of the contractual aspects listed in Section 1981(b). *See Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (Section 1981 "can be violated only by purposeful discrimination"). Unless a plaintiff has direct evidence of discrimination, claims under Section 1981 are generally evaluated using the burden-shifting scheme set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superseded in part* by the Civil Rights Act of 1991. Under this scheme, a plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

Once a plaintiff presents evidence sufficient to permit an inference of discrimination, and thus establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action, and produce some evidence in support of that reason. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *see Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant is able to meet this burden of production, the plaintiff, in order to prevail, must then present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089.

This *McDonnell Douglas–Burdine* framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases alleging racial discrimination, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184

(11th Cir.1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Nix,* 738 F.2d at 1184 (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 713–14, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)). The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

### 1. *Prima Facie Case*

Thus, under the *McDonnell Douglas* analysis, the plaintiff must first establish a *prima facie* case of race discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. The parties agree that, in order for the plaintiff to establish a *prima facie* case of race discrimination under the circumstances presented in this action, the plaintiff must show: 1) that it is a member of a protected class; 2) that it submitted an application or bid which met the requirements for an available contract; 3) that the application or bid was ultimately rejected; and 4) the contract was given to an individual or entity who was not a member of the protected class. *Brown v. Am. Honda Motor Co. Inc.,* 939 F.2d 946, 949 (11th Cir.1991); *see also Patterson,* 491 U.S. at 187, 109 S.Ct. 2363; *Howard v. BP Oil Co. Inc.,* 32 F.3d 520, 524 (11th Cir.1994); *Zaklama v. Mount Sinai Med. Ctr.,* 842 F.2d 291, 293 (11th Cir.1988). Defendant contends that plaintiff has failed to establish the elements of a *prima facie* case of race discrimination.

#### a. Is the plaintiff a member of a protected class?

■ As noted above, Section 1981 protects the rights of all "persons" within the jurisdiction of the United States to make and enforce contracts, as that right is "enjoyed by white citizens." The plaintiff in this action, however, is not a "person" but a corporation, and discerning the racial identity of a corporation could be quite daunting in many circumstances. Defendant has not argued that the plaintiff does not have standing to assert a claim under Section 1981, however, and the Court concludes that the plaintiff, a corporation owned by an African–American and staffed primarily with African–American employees, does have standing to assert a claim under Section 1981 based on racial discrimination directed at its owner and employees. Further, the racial identity that the parties and the Court assign to that corporation is an African–American or black racial identity. *See, e.g., John & Vincent Arduini Inc. v. NYNEX,* 129 F.Supp.2d 162, 169 (N.D.N.Y.2001) (corporation owned by two Caucasian males has standing to assert a Section 1981 claim based on its allegation that it was denied a contract because the company promoted a Hispanic male to a supervisory position); *Rosales v. AT & T Info. Sys., Inc.,* 702 F.Supp. 1489, 1495–1497 (D.Colo.1988) (corporation had standing to assert a Section 1981 claim based on its allegation that defendant denied its application for a dealership because it was owned by a Hispanic).

In the instant action, the plaintiff corporation itself suffered the alleged injury, the loss of a "contract" with defendant, although the purported race discrimination was directed towards the corporation's employees and/or its owner and President. Accordingly, the Court concludes that plaintiff has presented sufficient evidence that it is entitled to assert a claim as a member of a "protected class" based on the race of its President and CEO, and the race of the majority of its employees.

#### b. Did plaintiff apply for a contract with defendant?

■ It is undisputed that UTI never had any sort of written contract with Brit-

ish Airways. Nevertheless, it is also undisputed that UTI had an ongoing business relationship with British Airways from 1996 to January, 1999, through which UTI performed luggage delivery services for British Airways at Hartsfield on a regular basis, and that after January, 1999, British Airways refused to continue that business relationship and gave its luggage delivery business exclusively to ABE. Defendant contends that, because there was no written formal contract or agreement between the parties, and no specific agreement that British Airways would provide a certain amount of business to UTI over a certain period of time, plaintiff is unable to establish that defendant interfered with plaintiff's rights to make or enforce contracts in any way.

The Court first notes that nothing in the language of Section 1981 requires that a *written* contract be in place before a party may assert a claim. At-will employment contracts, for example, are almost always verbal, not written, and are terminable at the will of either party, but they are nevertheless considered "contracts" deserving of protection under Section 1981. *See Lauture v. Int'l Bus. Mach. Corp.,* 216 F.3d 258, 260 (2nd Cir.2000); *Perry v. Woodward,* 199 F.3d 1126, 1133 (10th Cir.1999); *Spriggs v. Diamond Auto Glass,* 165 F.3d 1015, 1018–19 (4th Cir.1999); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.,* 160 F.3d 1048, 1051–52 (5th Cir.1998). Furthermore, in amending Section 1981 in the 1991 Civil Rights Act, Congress intended to expand the scope of Section 1981 to cover a broad spectrum of racial discrimination in all aspects of contractual relations. *See Andrews v. Lakeshore Rehab. Hosp.,* 140 F.3d 1405, 1411 (11th Cir.1998) (noting that the 1991 Act's legislative history is "replete with expressions of Congress's intent to broaden section 1981 specifically to cover race-based retali-

ation in all phases of contractual relations").

Accordingly, the Court concludes that the informal business relationship between UTI and British Airways that existed from 1996 through January, 1999, by which UTI employees were permitted to routinely enter the British Airways baggage area at Hartsfield in order to pick up mishandled luggage for delivery, constituted an informal "contract" for the purposes of plaintiff's Section 1981 claim. As with at-will employment contracts, although the contract was not written, was not for a specific term, and apparently was terminable at-will by either party, there is no dispute that there was an informal business arrangement between the parties that allowed UTI employees to come to the British Airways baggage area to obtain mishandled luggage for delivery with the implicit understanding that British Airways would pay UTI an agreed-upon amount for the delivery of the bags.

Moreover, although there is no evidence that plaintiff ever filed a formal "application" for the contract, or submitted an official "bid," there is no evidence that defendant ever had in place any sort of formal application or bid procedure for its baggage delivery services. Instead, the evidence reflects that both UTI and ABE were actively competing for defendant's business on a regular basis and that defendant was certainly aware that UTI desired its business. Plaintiff has submitted several affidavits from UTI employees that they routinely went to the British Airways baggage area to inquire about any bags that needed to be delivered, and defendant has not disputed that they did so. Under these circumstances, the Court finds that plaintiff has submitted sufficient evidence to establish that they "applied" for a contract, *i.e.,* that they actively pursued an informal contract with British Airways to

deliver its mishandled baggage at Hartsfield.

### c. Was the plaintiff's application rejected?

 Although defendant argues that it never interfered with or impeded plaintiff's rights to make and enforce contracts at any time, there is no dispute that, in or around February, 1999, Ronnie Jennings decided that British Airways would no longer use the services of UTI for luggage delivery and that after that time, British Airways no longer used the services of UTI for luggage delivery. (*See* SMF at ¶ 5.) Furthermore, there is no dispute that British Airways chose to use ABE exclusively as its luggage delivery service after that date.

Accordingly, the Court finds that, under these circumstances, plaintiff has presented sufficient evidence to establish at the very least a genuine issue of material fact over whether it was "rejected" for the contract of performing luggage delivery services for British Airways.

### d. Was the contract given to an entity outside the protected class?

 As noted above, it is undisputed that, after February, 1999, British Airways decided that it would use ABE instead of UTI to deliver its mishandled luggage at Hartsfield. Plaintiff contends that the majority of the ABE employees working at Hartsfield were white, while the majority of UTI employees were black. According to plaintiff, the reason that British Airways chose ABE over UTI was that it preferred to have its luggage delivered by the mostly white employees of ABE rather than the mostly black employees of UTI. Defendant contends that plaintiff has failed to produce sufficient evidence that ABE was owned by whites, or that its employees were primarily white, and thus, that plaintiff has failed to present a *prima facie* case of race discrimination.

As defendant points out in its brief, "Neither Plaintiff nor Defendant has any evidence as to the ownership of ABE or of the racial make-up of its employees." (Def. Br. [20] at 10.) The Court agrees that no such statistical evidence has been presented by either party. Nevertheless, plaintiff has produced the affidavits of three individuals who worked for UTI delivering mishandled luggage at Hartsfield during the relevant time period and all three stated that, from their personal observation and experience, the majority of ABE employees who performed baggage delivery services at Hartsfield were Caucasian. According to Michael Wright, most of the ABE employees he saw were Caucasian. (Wright Aff. at ¶ 8; Pls. SMF at ¶ 9.) Grant Steele contends that three of the four ABE employees who worked the same shift that he worked were Caucasian. (Pls. SMF at ¶ 9; Steele Aff. at ¶ 9.) Furthermore, Demetrius Johnson states that, of the nine or ten ABE employees who worked the night shift at Hartsfield, "six or seven" were Caucasian. (Johnson Aff. at ¶ 9; Pls. SMF at ¶ 9.) Finally, Keith Burwell, UTI's President and CEO, also stated during his deposition that the majority of ABE's drivers were Caucasian. (Burwell Dep. at 151.)

In sum, plaintiff has presented the testimony of UTI employees who personally observed that the majority of ABE employees performing luggage delivery services at Hartsfield were white, but defendant argues that such anecdotal evidence, based on the limited personal observations and experience of a small handful of UTI employees, is insufficient as a matter of law to meet plaintiff's burden of establishing that ABE is outside the protected class.

The Court notes, however, that defendant, who should have access to this infor-

mation, has failed to present any evidence to dispute the allegations of the UTI employees that the majority of the ABE employees working at Hartsfield during the relevant time period were Caucasian. The *only* evidence in the record concerning the racial make-up of the ABE workforce is the testimony of the four individuals described above. Thus, the testimony of Wright, Steele, Johnson, and Burwell that the majority of the ABE employees working out of Hartsfield were Caucasian remains unrefuted. Further, defendant does not attempt to dispute plaintiff's evidence regarding the racial composition of the ABE workforce; it argues only that plaintiff's proffered evidence is insufficient to meet its burden to present a *prima facie* case.

In light of the fact that plaintiff's evidence remains completely unrefuted by defendant, the Court must conclude that plaintiff has presented more than a "scintilla" of evidence to support its allegation that the majority of ABE employees who performed luggage delivery services for British Airways at Hartsfield during the relevant time period were Caucasian and that the majority of comparable employees for UTI were African–American. Accordingly, plaintiff has produced sufficient evidence to assign to itself a label as an African–American or black company and to assign a label to ABE as a white or Caucasian company. As defendants treated plaintiff less favorably than its competitor, ABE, plaintiff has made out a prima facie case. The Court is not required to determine at this stage whether plaintiff has produced sufficient evidence to *prove* its case conclusively; the Court's role is to determine whether the plaintiff has produced sufficient evidence that *could* be viewed as sufficient proof of its allegation in the eyes of a rational jury. The Court concludess that plaintiff has done so on this issue. Accordingly, the Court con-

cludes that plaintiff has presented sufficient evidence to establish a *prima facie* case of race discrimination under Section 1981.

### 2. *Legitimate Non-discriminatory Reason*

■ The next step in the *McDonnell Douglas* analysis shifts the burden to defendant, who must produce some evidence of a legitimate non-discriminatory reason for its action. In this case, defendant has produced evidence of a legitimate non-discriminatory reason for its decision to use ABE for its baggage delivery services over UTI. According to defendant's employee Ronnie Jennings, in or about February, 1999, he made the decision that British Airways would no longer use the services of UTI for luggage delivery. (SMF at ¶ 5.) Jennings contends that he decided to use ABE instead of UTI for the airline's mishandled baggage deliveries because he had received numerous complaints from passengers about untimely deliveries by UTI. (*See* SMF at ¶ 5; Jennings Dep. at 9.) Defendant has presented the deposition testimony and sworn affidavit of Jennings, as well as the sworn affidavits of defendant employees Pete Tamburello and Roy Duque in support of this contention that British Airways received complaints from passengers about the services performed by UTI, and that fewer complaints were received from passengers about the services provided by ABE.

As with the plaintiff's burden in presenting a *prima facie* case, the Court's role is not to weigh defendant's proffered evidence as to its legitimate non-discriminatory reason, nor to evaluate the persuasiveness of its asserted justification. The Court thus concludes that the defendant has produced sufficient evidence that it had a legitimate, non-discriminatory reason for its selection of ABE over UTI as

its sole luggage delivery service. In order to defeat defendant's motion for summary judgment, therefore, the plaintiff must present some evidence that defendant's proffered reason is merely a pretext for unlawful race discrimination.

### 3. *Pretext*

A plaintiff alleging race discrimination may carry its final burden of showing that the defendant's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. The plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the decision or show indirectly that the defendant's ultimate justification is simply not believable. *See Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citation omitted). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the defendant were not the real reasons for the defendant's actions. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

Plaintiff contends that it has presented sufficient evidence that defendant's proffered reason is merely a pretext for unlawful race discrimination, and the Court agrees. First, plaintiff argues that defendant's proffered evidence in support of its justification of "numerous" complaints from passengers regarding UTI's services is very weak and that defendant's evidence is directly refuted by a sworn affidavit from Jo–Ann Saunders, a former employee of defendant. Second, plaintiff argues that Jennings admittedly based his decision in large part upon information he received from subordinates, including Pete Tamburello. Finally, plaintiff contends that it has presented evidence demonstrating that Tamburello harbored a racial animus towards African–Americans and towards the African–American employees of UTI in particular.

Plaintiff first argues that defendant's proffered reason for choosing to use the services of ABE over UTI is simply not credible. Contrary to defendant's contention, plaintiff argues that it had no late deliveries for any British Airways passengers, and that it performed luggage delivery services at least as well as, if not better than, ABE. Keith Burwell, President and CEO of UTI, states that he monitored UTI's performance for baggage deliveries for British Airways, and UTI had no late deliveries. (Pls. SMF at ¶ 18; Burwell Dep. at 109.) Burwell further contends that Jennings told him that UTI's services were as good as, if not better than, ABE's services with respect to speed and efficiency. (Pls. SMF at ¶ 19; Burwell Dep. at 119.)

Furthermore, plaintiff argues that Jennings was not personally aware of any complaints lodged against UTI by passengers, and relied solely on what he was told by other British Airways employees. Although Jennings contends that he made the decision to use ABE on the grounds that British Airways had received numerous complaints from passengers about the luggage delivery services provided by UTI, during his deposition he was not able to recall the name of a single customer who had complained about UTI, nor was he able to identify a single document or a writing of any kind that related to any complaint lodged against UTI or Burwell. (Jennings Dep. at 10.) Furthermore, Jennings was unable to estimate the number of complaints received from passengers

about UTI and could state only that such complaints were "regular." (*Id.*) Finally, he admitted that no passenger had ever complained directly to him about UTI, and that he relied on information he had received from other British Airways employees: "Well, I'm trusting that my staff wouldn't be telling me misinformation." (*Id.*)

Two of the staff members that Jennings relied on most were Roy Duque and Pete Tamburello, and both of those individuals have also provided affidavits that they received complaints from passengers about the services provided by UTI. Jennings admitted freely that he relied heavily on information from received from Pete Tamburello concerning the amount and nature of passenger complaints about baggage delivery. As Jennings stated during his deposition: "Well, Pete Tamburello is more or less our British Airways baggage guru. He does most of the work in baggage service, does call-backs to the customer and would more often than not, if he were available in the office, be referred calls to passengers missing baggage." (Jennings Dep. at 11.)

According to plaintiff, Tamburello was the British Airways employee who was actually most responsible for the day-to-day decisions regarding which luggage delivery service would be used by British Airways, which appears to be consistent with Jennings's testimony cited above. (*See* Pls. SMF at ¶ 13; Saunders Aff. at ¶ 7.) Plaintiff has presented the sworn affidavit of Jo–Ann Saunders, who worked for British Airways as a customer service agent from August, 1998, to May, 1999, during which time one of her responsibilities was arranging for baggage deliveries. (Pls. SMF at ¶ 11; Saunders Aff. at ¶¶ 3–4.) Saunders observed Tamburello take bags labeled with BDO's marked "universal" and replace the tags with BDO's

marked "ABE." (Pls. SMF at ¶ 15; Saunders Aff. at ¶ 9.) Contrary to the affidavit testimony from Tamburello and Duque that ABE provided better service than did UTI, however, Saunders contends that, in her experience, UTI employees inquired more frequently about baggage deliveries than did ABE employees, and UTI's delivery times were faster than those of ABE. (Pls. SMF at ¶ 16; Saunders Aff. at ¶ 10.)

In addition to presenting evidence that defendant's proffered reason for choosing ABE over UTI is not credible, plaintiff has also provided evidence that Tamburello, the British Airways "baggage guru," harbored a racial animus against African–Americans and against the African–American employees of UTI in particular. Saunders contends that, on one occasion when she was in the supply room behind the ticket counter, she overheard Tamburello say to a Caucasian employee of ABE that "when they [British Airways] get their bags delivered by Ultimax, the bags will smell like fried chicken." (Pls. SMF at ¶ 12; Saunders Aff. at ¶ 5.) She interpreted that comment as a racial slur against African–Americans, based on a racial stereotype that black people like to eat fried chicken. (Pls. SMF at ¶ 14; Saunders Aff. at ¶ 8.) Saunders states that Tamburello did not know she was in the room when he made that statement and when he saw her, "his face turned red and he turned away from me." (Pls. SMF at ¶ 12; Saunders Aff. at ¶ 6.)

In consideration of all this evidence, the Court concludes that the plaintiff has presented sufficient evidence that would enable a rational jury to conclude that defendant's proffered reason for choosing to use the baggage delivery services of ABE over UTI is not credible and is instead merely a pretext for race discrimination. Plaintiff has gone far beyond merely disputing defendant's contention that defendant re-

ceived numerous complaints about UTI, and has produced substantial evidence calling that contention into doubt. Furthermore, although Tamburello's "fried chicken" statement, standing alone, is not conclusive evidence that he harbored a racial animus against African–Americans, given the evidence that Tamburello was a key figure in the decision to stop using UTI's services, if a jury construed that statement as reflecting such an animus, the statement could be considered to bolster plaintiff's argument that race discrimination was the real reason motivating the decision to choose ABE over UTI.

Therefore, the Court concludes that plaintiff has succeeded in meeting its burden of presenting evidence sufficient to cast doubt on defendant's proffered explanation, and thus, has succeeded in establishing a genuine issue of material fact as to whether defendant's explanation was merely a pretext for race discrimination. Accordingly, defendant is not entitled to summary judgment on plaintiff's claim of race discrimination under 42 U.S.C. § 1981.

## CONCLUSION

For the foregoing reasons, defendant's Motion to Strike Affidavits of Michael Wright, Grant Steele, Demetrius Johnson, and Jo–Ann Saunders [27] is **GRANTED IN PART and DENIED IN PART,** and defendant's Motion for Summary Judgment [20] is **DENIED.**

Pursuant to the Scheduling Order [12] entered on May 21, 2001, the parties shall submit a proposed Consolidated Pretrial Order within **thirty (30) days** of the date of this Order.