Mary Beth OCASIO, Plaintiff,

v.

LEHIGH VALLEY FAMILY HEALTH
CENTER, Defendant.

No. 2:00–CV–03555–RB.

United States District Court,
E.D. Pennsylvania.

Jan. 30, 2003.

Theodore Q. Thompson, Ambler, PA, for Plaintiff.

A. James Johnston, Jonathan B. Sprague, Yvonne R. Haddad, Philadelphia, PA, Glenn Guanowsky, Allentown, PA, for Defendant.

---

### MEMORANDUM

BUCKWALTER, District Judge.

Presently before the Court is Defendant Lehigh Valley Family Health Center's Motion for Summary Judgment and Plaintiff Mary Beth Ocasio's Response thereto. For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

On December 18, 1998, Lehigh Valley Family Health Center (hereinafter referred to as "Lehigh Valley" or "Defendant") offered Mary Beth Ocasio (hereinafter referred to as "Ocasio" or "Plaintiff") a position as a Medical Assistant. Ocasio started work on January 4, 1999.

Effective July 26, 1999, Lehigh Valley gave Ocasio a .50 cents an hour raise as part of a "market adjustment," which increased Ocasio's hourly wage to $10.25. Def.'s Mot. Summ. J.-Ex. J, July 26, 1999 Personnel Action Form. Soon thereafter, Lehigh Valley gave Ocasio a .25 cents an hour raise for "additional duties." This "additional duties" raise was effective August 2, 1999 and increased Ocasio's hourly wage to $10.50 an hour. Def.'s Mot. Summ. J.-Ex. K, Aug. 2, 1999 Personnel Action Form. A little over six months after starting at Lehigh Valley, Ocasio received, in total, a .75 cents an hour raise.

In August of 1999, Ocasio received her six-month performance review. Def.'s Mot. Summ. J.-Ex. L, Ocasio Dep. II (hereinafter referred to as "Ocasio Dep. II") at Ex. 27. In this review, Ocasio received an overall performance score of 3.1. *Id.* On a "5" point scale, "3" indicates that the "performance standard is consistently met." *Id.* This review identified problems such as Ocasio "being absent from the floor when needed" and "get[ting] flustered easily." *Id.*

Significantly, among Ocasio's "strengths," as recognized by Lehigh Valley, was Ocasio's role as a "strong patient advocate for the Hispanic population." *Id.* Ocasio, however, "totally disagree[d]" with the performance review but did acknowledge that she had "some conflict with certain individuals" at work. *Id.*

Ocasio's performance problems at Lehigh Valley continued. On February 21, 2000, Ocasio received a written warning for seven (7) occurrences of absenteeism within a 12–month period. *Id.* at Ex. 11. Ocasio acknowledged the validity of this written warning. *Id.* at 57–58.

On March 1, 2000, Ocasio underwent a "verbal counseling session" with Sherry Roth ("Roth"), the Practice Manager. *Id.* at Ex. 12. During this session, Roth counseled Ocasio for sending, to a co-employee, an inappropriate, unprofessional and insensitive e-mail. *Id.* While Ocasio "believed" that Roth counseled her in retaliation for Ocasio's "complaints" of alleged patient mistreatment, Ocasio also testified that she did not know why Roth wrote the verbal counseling session memorandum. *Id.* at 62–63.

On April 6, 2000, Roth again met with Ocasio to counsel Ocasio about miscellaneous complaints concerning job performance. Roth counseled Ocasio about changing her work assignments without consulting designated supervisors and for "creating a hostile work environment" due to her attitude towards other employees as well as supervisors, managers, and directors. *Id.* at Ex. 15. Ocasio, at her deposition, conceded that other individuals could interpret her passionate and expressive communication style, as an Hispanic, as anger. *Id.* at 86–89.

On April 28, 2000, Ocasio received a second written warning regarding eight (8) absences within the last 12–month period. *Id.* at Ex. 16. At her deposition, Ocasio conceded that this disciplinary action was justified. *Id.* at 102.

On May 4, 2000, Ocasio received yet another written confirmation of counseling. *Id.* at Ex. 19. Among other things, Ocasio was counseled for leaving the flexible sigmoid scope in disinfecting solution for more than five (5) hours when Lehigh Valley's procedures required that the equipment remain in the disinfecting solution for at least 20 minutes, but for no more than 40 or 45 minutes. Ocasio was

warned that failure, on her part, to improve her performance could result in further disciplinary action up to and including suspension or termination. *Id.*

Also on May 4, 2000, Ocasio received a "final warning." *Id.* at Ex. 20. Ocasio received this warning for breaking the chain of command when she e-mailed a physician to complain about her supervisors. *Id.* at 109–111.

But the problems encountered in this case were not one-sided. During her employment at Lehigh Valley, Ocasio alleges that she was not always treated appropriately by Defendant. For example, Ocasio complains of generally feeling isolated and of receiving the "cold shoulder" from some of her co-employees and supervisors. *See* Def.'s Mot. Summ. J.-Ex. I, Ocasio Dep. I (hereinafter referred to as "Ocasio Dep. I") at 21–22, 71, 100–01; Ocasio Dep. II at 14, 22–23. She also complains that she was subjected to "excessive discipline," *see* Ocasio Dep. II at 44, that she was told not to speak Spanish with her co-employees, *see id.* at 189, and that she was not adequately trained. *See* Ocasio Dep. I at 172–79. Finally, Ocasio alleges that references to Hispanic employees as "Spanish people," a joke about the work ethic of Puerto Ricans, and an e-mail making fun of the way a Spanish speaking patient pronounced the word "gateway" created a hostile work environment. *Id.* at 189–200.

Therefore, on July 24, 2000, Ocasio filed her original Complaint. In her original Complaint, Ocasio asserted civil rights claims under the First Amendment, the Fourteenth Amendment, and 42 U.S.C. §§ 1981, 1982, 1985(1)(3), 1986 and 1988. She also made supplemental state law claims for intentional infliction of emotional distress ("IIED") and negligent supervision.[1]

On October 19, 2000, performance-based merit raises went into effect, Ocasio, however, did not receive a merit raise. Def.'s Mot. Summ. J.-Ex. M, Ocasio Dep. III (hereinafter referred to as "Ocasio Dep. III") at Ex. 43. Roth, in her managerial discretion, decided not to give performance-based merit raises to Lehigh Valley employees who, like Ocasio, had received a final warning during the past year—that is, from July 1, 1999 to July 1, 2000. *Id.*

While on final warning status, Ocasio had three altercations—two with the same co-employee and one with a supervisor. The first incident occurred in November 2001 when Ocasio approached an Hispanic co-employee, Josie Clark ("Clark"), and inquired how Lehigh Valley could have obtained a June 10, 2000 e-mail from Ocasio to Clark for use by defense counsel in Ocasio's September 14, 2001 deposition. *See* Def.'s Mot. Summ. J.-Ex. N, Ocasio Dep. IV (hereinafter referred to as "Ocasio Dep. IV") at 21–27. Clark complained to management that Ocasio had threatened her. *Id.* at 28. Roth then told Ocasio that Clark felt threatened by Ocasio's contact with her concerning the e-mail. *Id.* Lehigh Valley suspended Ocasio, with pay, pending an investigation. Def.'s Mot. Summ. J.-Ex. P, Dec. 11, 2001 Personnel Report. After an investigation, Lehigh Valley confirmed Clark's accusations that Ocasio had threatened her over the disclosure of the e-mail. *Id.* On December 10, 2001, Lehigh Valley suspended Ocasio for one day, without pay. *Id.* The Personnel Report relating to this incident stated that

---

1. On November 3, 2000, this Court granted Defendant's Motion to Dismiss Plaintiff's claims under the First and Fourteenth Amendments and § 1982, § 1985(1), § 1985(3), § 1986, and § 1988. *Ocasio v. Lehigh Valley Family Health Ctr.*, No. 00–CV–3555, 2000 WL 1660153, *4, 2000 U.S. Dist. LEXIS 16014, at *12 (E.D.Pa. Nov. 3, 2000) (Backwalter, J.). This Court, however, denied Defendant's Motion to Dismiss as to Plaintiff's IIED claim. *Id.*

"[a]ny further incidents of this type towards any employee will be grounds for termination." *Id.*

The second incident, and the one that lead to Ocasio's termination on February 18, 2002, also involved Clark. On February 4, 2002, Ocasio telephoned an Hispanic out-patient to tell her to come to the Family Health Center and pick up a disability form and a prescription. *See* Ocasio Dep. IV at 48. Ocasio placed the prescription and disability form in the patient pick-up box on the first floor. *Id.* at 50. But when the out-patient arrived, the receptionist on-duty, Clark, sent the patient upstairs to see Ocasio. *Id.* at 60. Clark did not direct the patient to the pick-up box as Ocasio wanted.

Ocasio then walked the patient back downstairs to pick up the paperwork. *Id.* at 64–65. Ocasio was angry with Clark for sending the patient upstairs, and she slammed the drawer of the pick-up box in frustration. *Id.* at 72.

After Ocasio walked the patient to the door, she heard Clark tell two staff members that Ocasio had a "problem." *Id.* at 73. Ocasio then opened the window at the receptionist greeting area and asked Clark if there was a "problem." *Id.* According to Ocasio, Clark then started yelling at her, and Ocasio walked away. *Id.*

Ocasio acknowledges that Lehigh Valley policy prohibits arguments between and among staff in front of patients. *Id.* at 70. Ocasio agrees with this policy and also considers it unprofessional for staff to argue among themselves in front of patients. *Id.* She admits that she did not show good judgment in slamming the cabinet drawer and that this conduct was unprofessional. *Id.* at 76–77. Ocasio also believes that she should have been suspended, not terminated, for her altercation with Clark. *Id.* at 87. The altercation, however, did not end with Ocasio walking away from Clark. In-

stead, the altercation resulted in the third and final incident.

After walking away from Clark, Ocasio sought Clark's supervisor, Dorene Svanda ("Svanda"), the Administrative Coordinator. *Id.* at 88. Ocasio admits that she yelled and cursed at Svanda when expressing her displeasure over the incident with Clark. *Id.* at 95.

After these incidents, Ocasio met with a management team on February 7, 2002. *Id.* at 101–104. During this meeting, the two incidents from February 4, 2002 were investigated—the "drawer slamming" incident and the yelling incident with Svanda. *Id.* At the conclusion of the February 7, 2002 meeting, Ocasio was suspended and told to go home. *Id.* at 106.

Lehigh Valley summoned Ocasio back from suspension for another meeting with management on February 18, 2002. *Id.* This meeting was held to clarify the events of February 4, 2002 and to give Ocasio the opportunity to present more information about these events. But at the conclusion of the February 18th meeting, management informed Ocasio that she was terminated effective immediately.

By letter dated February 26, 2002, Ocasio received written confirmation of her termination effective February 18, 2002. The termination letter gave the following three reasons for Ocasio's discharge:

1. "You [Ocasio] initiated the inappropriate verbal interaction of February 4, 2002 with Ms. Clark in the patient waiting room. This action on your part resulted in the patients being exposed to a non-professional atmosphere.

2. You used repeated vulgarities in your confrontation with a supervisor immediately after the incident.

3. As stated previously in this letter, behaviors you exhibited on February

4, 2002 are similar to the behaviors that you have exhibited in the past. Despite repeated warnings, of which you have acknowledged receipt, you have continued to repeat those behaviors. The behavioral standards and expectations that have been repeatedly communicated to you are the same standards of behavior expected of everyone employed in this practice."

Def.'s Mot. Summ. J.-Ex. U, Termination Letter at 2. Ocasio agrees with the conclusions reached in items numbered one and two. Ocasio Dep. IV at 136.

Lehigh Valley filed the instant Motion for Summary Judgment as to Plaintiff's remaining 42 U.S.C. § 1981 claim and her IIED claim, to which Plaintiff responds.[2]

## II. STANDARD OF REVIEW

A motion for summary judgment will be granted where all of the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Since a grant of summary judgment will deny a party its chance in court, all inferences must be drawn in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The ultimate question in determining whether a motion for summary judgment should be granted is "whether reasonable minds may differ as to the verdict." *Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120, 129 (3d Cir.1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## III. ANALYSIS

### A. Section 1981

42 U.S.C. § 1981 states in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). While most cases brought under § 1981 relate to the making and enforcing of contracts, that section "has broad applicability beyond the mere right to contract." *Mahone v. Waddle*, 564 F.2d 1018, 1028 (3d Cir.1977).

When analyzing a claim under section 1981, the Court will apply the familiar burden-shifting framework first set forth by the Supreme Court in *McDonnell*

---

**2.** Lehigh Valley moved for summary judgment on the original Complaint's surviving claims: § 1981, IIED, and negligent supervision. On December 11, 2001, this Court granted Lehigh Valley's original Motion for Summary Judgment. *Ocasio v. Lehigh Valley Family Health Ctr.*, No. 00–3555, 2001 U.S. Dist. LEXIS 20449 (E.D.Pa. Dec. 11, 2001) (Buckwalter, J.). Plaintiff, however, moved for reconsideration based on service issues. On January 9, 2002, this Court granted Ocasio's Motion for Reconsideration and vacated its Order of December 11, 2001. On April 29, 2002, Ocasio filed an Amended Complaint and re-opened this case. The Amended Complaint dropped the negligent supervision claim and re-alleged the § 1981 based claims and the state law IIED claim.

*Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and subsequently refined in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also Jones v. Sch. Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999) (noting that the "familiar burden-shifting framework" applies to both Title VII and section 1981 claims). Under this framework, Plaintiff must show, by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the employee is able to do this, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions against the employee. *Id.* If the employer can meet this burden, then the burden shifts back to the employee to prove, by a preponderance of the evidence, that the reasons articulated by the defendant were actually a pretext for discriminatory practices. *Id.* at 804, 93 S.Ct. 1817. Summary judgment is appropriate on behalf of the employer if the employee fails to meet its burden at either the prima facie or pretext stage in the framework.

As a result of allegedly discriminatory and retaliatory practices of Defendant, Ocasio filed claims against Defendant under 42 U.S.C. § 1981 (" § 1981"). In Count I of her Amended Complaint, Plaintiff alleges, *inter alia,* that "[b]y creating, condoning, and perpetuating a racially hostile work environment, defendant has intentionally and with reckless indifference and disregard violated Plaintiff's rights under 42 U.S.C. § 1981." Pl.'s Am. Compl. at 32. Plaintiff also alleges that "Plaintiff's race was one of the determining factors, along with retaliation, in connection with defendant's discriminatory treatment of Plaintiff during her employment with defendant." Pl.'s Am. Compl. at 37. The Court will address each § 1981 claim separately.

### 1. Hostile Work Environment

To establish a prima facie case for a hostile work environment, Plaintiff must establish that: "(1) she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3d Cir.1996).

A hostile work environment exists when the harassment is persistent or severe enough "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank. FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). When determining whether a hostile work environment exists, the Court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ Considering the totality of the circumstances, the Court finds that Plaintiff fails to support a racially hostile work environment claim. Plaintiff fails to demonstrate that the alleged discrimination was pervasive and regular, and Plaintiff also fails to demonstrate how many of the instances relate to her race.

First, Ocasio complains of generally feeling isolated and of receiving the "cold shoulder" from some of her co-employees and supervisors. *See* Ocasio Dep. I at 21–22, 71, 100–01; Ocasio Dep. II at 14, 22–23. In her deposition, Ocasio does not demon-

strate that the "cold shoulder" treatment is related to her race. She acknowledges, however, other reasons why some would give her the "cold shoulder," all unrelated to race. *See e.g.*, Ocasio Dep. II at 29–30 (Plaintiff stated that co-worker "Ray [Nino] didn't think too much of me... because I helped his [estranged] wife out.").

Second, Ocasio complains of alleged "excessive discipline." *Id.* at 44. Ocasio, however, believes the "excessive discipline" was due to what she perceived as retaliation for her complaints of alleged patient mistreatment, not because of her race. *Id.* at 44–46.

Third, Lehigh Valley told Ocasio not to speak Spanish with her co-employee, Clark. *Id.* at 189. Ocasio, however, was encouraged to speak Spanish as a translator to those patients who needed assistance in understanding. *Id.* at 199. Additionally, Ocasio was never disciplined for speaking Spanish at work to co-employees. *Id.*

Fourth, Ocasio complains that two employees, Jennifer Smetana ("Smetana") and Ray Nino ("Nino"), provided her with inadequate training and hid equipment from her. Ocasio Dep. I at 172–79. No evidence exists, however, that two employees, one of whom is Hispanic, engaged in the alleged conduct on account of Ocasio's race. Additionally, Ocasio admits that Nino's differences with her were due to her relationship with Nino's estranged wife. *Id.* at 178–79.

Finally, Ocasio contends that references to Hispanic employees as "Spanish people," a joke about the work ethic of Puerto Ricans, and an e-mail making fun of the way a Spanish speaking patient pronounced the word "gateway" creates a hostile work environment. *Id.* at 189–200. The record indicates that Ocasio worked at Lehigh Valley for a little over three years—from January 4, 1999 to her termi-

nation on February 18, 2002. The incidents that allegedly created a hostile work environment were separate, isolated acts that occurred at distinct times during the course of her employment. Therefore, considering the totality of the circumstances, these incidents do not rise to the level of pervasive and regular discrimination as required to establish a hostile environment claim.

Accordingly, Defendant's motion for summary judgment based on Plaintiff's hostile work environment claim is granted.

### 2. *Racial Discrimination*

■ To state a claim for racial discrimination under § 1981, Plaintiff is required to allege (1) that she is a member of a racial minority; (2) that defendants intentionally discriminated against her on the basis of her race; and (3) that the discrimination was directed toward one or more of the activities protected by the statute. *Ackaa v. Tommy Hilfiger Co.*, No. 96–8262, 1998 WL 136522, *2, 1998 U.S. Dist. LEXIS 3570, at *6 (E.D.Pa. Mar. 24, 1998). Section 1981 can be violated only by intentional discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).

■ Ocasio fails to demonstrate a prima facie case of racial discrimination as she cannot point to facts in the record indicating that Lehigh Valley intentionally discriminated against her based on her race. Furthermore, she believes that retaliation for her patient advocacy, and not racial discrimination, motivated Lehigh Valley to suspend her on December 10, 2001 and terminate her on February 18, 2002. *See* Ocasio Dep. I at 98–106; Ocasio Dep. II at 128–31, 161–69; Ocasio Dep. IV at 39–44, 156.

■ Assuming, *arguendo*, Ocasio could demonstrate a prima facie case of racial discrimination, Lehigh Valley articulated a legitimate, nondiscriminatory reason for its suspension and ultimate termination of Plaintiff. As for the December 10, 2001 suspension, Clark, an Hispanic co-employee, had complained to Lehigh Valley management about alleged threats made by Ocasio to her concerning how Lehigh Valley's defense counsel had obtained an e-mail Ocasio had sent to Clark. *See* Def.'s Mot. Summ. J.-Ex. P, Dec. 11, 2001 Personnel Report; Ocasio Dep. IV at 28–42. After investigating Clark's complaint, Lehigh Valley determined that Ocasio had threatened Clark, and this is a legitimate, non-discriminatory reason for Ocasio's suspension.

As for the February 18, 2002 termination, Ocasio herself acknowledged that Lehigh Valley had legitimate reasons for taking disciplinary action against her. Ocasio Dep. IV at 70–77, 85–87, 99–101, 135–36. She stated that she was on final warning status when she confronted Clark in front of patients and later used vulgarities when yelling in anger at Clark's supervisor. *Id.* at 132–36, 171. Plaintiff concedes that Lehigh Valley was justified to suspend her, without pay, based upon this disruptive behavior. *Id.* at 87. Ocasio simply believes that termination was not warranted in this situation. This decision, however, is within the province of Lehigh Valley. As such, Lehigh Valley has set forth legitimate, non-discriminatory reasons for Ocasio's suspension and termination. Under the law of this circuit, notably *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir.1994), it is incumbent upon Ocasio to point to evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Lehigh Valley's reasons that one could reasonably conclude that the reasons are untrue. She has failed to point to such evidence.

Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of racial discrimination.

3. *Retaliation*

Under Third Circuit precedent, "to advance a prima facie case of retaliation, a plaintiff must show that: (1) the employee engaged in protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000).

For purposes of its Motion for Summary Judgment, Defendant does not dispute prongs one and two, but rather asserts that Plaintiff cannot demonstrate a nexus between the protected activity and any adverse employment action, and thus fails prong three of the prima facie test. "[I]n cases where a plaintiff must illustrate a 'causal link' for purposes of establishing retaliation, or show that certain conduct was 'used' as a basis for employment decisions, a plaintiff may rely upon a broad array of evidence to do so." *Id.* at 283–84.

■ Plaintiff's evidence, however, is insufficient to illustrate a causal link for purposes of establishing retaliation as Ocasio bases her allegations on mere beliefs and conclusory statements. She states that she has a "feeling" that Lehigh Valley suspended her on December 10, 2001 and fired her on February 18, 2002 because of the present lawsuit and her patient advocacy. The following exchange occurred in Plaintiff's deposition:

QUESTION: Do you have any evidence or information or knowledge to support your accusation that... they issued this one day suspension to retaliate against you because you were speaking up on behalf of Hispanic patients?

ANSWER: It's just a feeling. I feel and I believe that this is what they did. Ocasio Dep. IV at 40–41. Ocasio, as the non-moving party, "cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion." *Warner v. Montgomery Twp.*, No. 01–3309, 2002 WL 1623774, *4, 2002 U.S. Dist. LEXIS 13257, at *13 (E.D.Pa. July 22, 2002). Ocasio's mere belief that she is a retaliation victim is insufficient to thwart summary judgment.

Finally, even if Plaintiff had satisfied her prima facie case of retaliation, Lehigh Valley has stated a legitimate, non-retaliatory reason for terminating Plaintiff's employment that Plaintiff has not pierced with facts of record as previously discussed. Specifically, Lehigh Valley asserts that it terminated Plaintiff due to documented examples of Plaintiff's misconduct, much of which Plaintiff admits. Plaintiff, in turn, has not set forth sufficient evidence showing that Lehigh Valley's reason was pretextual. Accordingly, the Court grants Defendant's motion for summary judgment relating to Plaintiff's retaliation claim.

### B. Intentional Infliction of Emotional Distress

Finally, Defendant moves for summary judgment relating to Plaintiff's IIED claim. Defendant argues that Plaintiff's IIED claim is barred by the Pennsylvania Workers' Compensation Act ("WCA"). In the alternative, even if the IIED claim is not barred by the WCA, Defendant argues that it is still entitled to summary judgment as it did not engage in extreme or outrageous conduct. These two arguments are addressed below in turn.

**3.** The "personal animus" exception is also referred to as the "third-party attack" excep-

#### 1. *The Exclusivity of the WCA*

■ In general, the WCA provides the exclusive remedy for employee work-related injuries. *See* 77 Pa. Stat. Ann. § 481(a). The exclusivity provision of the WCA states, "[t]he liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees...." *Id.* As such, the WCA bars Plaintiff's claim for intentional infliction of emotional distress. *See Matczak v. Frankford Candy and Chocolate Co.*, 136 F.3d 933, 940 (3d Cir.1997).

■ The statute, however, carves out an exception to the rule barring claims for intentional infliction of emotional distress if the actor was motivated by personal animus. 77 Pa. Stat. Ann. § 411(1); *Fugarino v. Univ. Servs.*, 123 F.Supp.2d 838, 843 (E.D.Pa.2000). Specifically, the exception provides that:

> The term 'injury arising in the course of his employment,' as used in this article, shall not include an injury caused by the act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment. 77 Pa. Stat. Ann. § 411(1).

Therefore, to set forth a valid cause of action implicating the personal animus exception [3], "an employee must assert that [her] injuries are *not* work-related because [she] was injured by a co-worker for purely personal reasons." *Kohler v. McCrory Stores*, 532 Pa. 130, 137–38, 615 A.2d 27 (Pa.1992).

In the present case, the Plaintiff summarily states that she "has alleged a pattern of racial harassment and has alleged that defendants retaliated against her for complaining about the harassment." Pl.'s

tion.

Resp. at 15–16. The Court finds that all of Lehigh Valley's challenged conduct—including the December 10, 2001 suspension and the February 18, 2002 termination—was entirely work-related and arose solely from the employment relationship. Consequently, the WCA exception does not apply, and the WCA would bar Plaintiff's IIED claim. The Court, however, need not decide this question because, even assuming the WCA exception does apply, Defendant did not engage in extreme and outrageous conduct.

### 2. *The Extreme and Outrageous Element*

To establish a claim for IIED, Plaintiff must show that the: (1) conduct was extreme and outrageous; (2) conduct was intentional or reckless; (3) conduct caused emotional distress; and (4) the distress was severe. *Tupper v. Haymond & Lundy,* No. 00–3550, 2001 WL 936650, *5, 2001 U.S. LEXIS 12399, at *17 (E.D.Pa. Aug. 16, 2001). The conduct complained of must be so outrageous, and so extreme in degree, as to be regarded as " 'atrocious' and 'utterly intolerable in a civilized community.' " *Clark v. Township of Falls,* 890 F.2d 611, 623 (3d Cir.1989) (citations omitted).

The Court concludes that Plaintiff's claim fails because Plaintiff fails to provide evidence of such extreme and outrageous conduct necessary to defeat Defendant's motion for summary judgment. Furthermore, in light of the Court's finding that the Plaintiff was not subjected to a hostile work environment nor was she subjected to racial discrimination, Defendant also is entitled to summary judgment as to Plaintiff's IIED claim.

### IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. An appropriate order follows.

### *ORDER*

**AND NOW**, this 30th day of January, 2003, upon consideration of Defendant Lehigh Valley Family Health Center's Motion for Summary Judgment (Docket No. 36) and Plaintiff's Response thereto (Docket No. 37), it is **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. Judgment is entered in favor of Defendant Lehigh Valley Family Health Center and against Plaintiff Mary Beth Ocasio.

This case is **CLOSED**.